# Illinois Official Reports

## Appellate Court

<div style="border">

### *In re S.W.N.*, 2016 IL App (3d) 160080

</div>

| | |
|---|---|
| Appellate Court Caption | *In re* S.W.N., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. S.W.N., Respondent-Appellant). |
| District & No. | Third District<br>Docket No. 3-16-0080 |
| Filed | July 13, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Bureau County, No. 15-JD-30; the Hon. Marc P. Bernabei, Judge, presiding. |
| Judgment | Vacated in part and reversed in part.<br>Cause remanded. |
| Counsel on Appeal | Michael J. Pelletier and Jay Wiegman, both of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>Geno J. Caffarini, State's Attorney, of Princeton (Mark A. Austill, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.<br><br>Eric M. May, of Princeton, guardian *ad litem*. |
| Panel | JUSTICE LYTTON delivered the judgment of the court, with opinion.<br>Justices Holdridge and McDade concurred in the judgment and opinion. |

**OPINION**

¶ 1     Respondent, S.W.N., appeals from his adjudication for delinquency based on the offense of criminal sexual assault. Respondent argues that his confession, which was admitted at trial, should have been suppressed because he did not knowingly and intelligently waive his *Miranda* rights. We vacate the trial court's adjudication of delinquency, reverse its order denying respondent's motion to suppress his confession, and remand the matter for further proceedings.

¶ 2                                      FACTS

¶ 3     The State filed a petition for adjudication of wardship in which it alleged that respondent, a minor, was delinquent in that he had committed the offense of criminal sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2014)). Specifically, the petition alleged that respondent "knowingly committed an act of sexual penetration by the use of force or threat of force by holding B.L. against a wall and placing his penis into the vagina of B.L." Respondent subsequently filed a motion to suppress statements, arguing that due to a mental deficiency he "was not able to sufficiently comprehend his rights per *Miranda v. Arizona*, 384 U.S. 436 (1966)."

¶ 4     At the hearing on respondent's motion, Officer Christopher Erickson of the Princeton police department testified that he was a certified juvenile officer. At approximately 3:30 p.m. on August 11, 2015, Erickson drove to respondent's house in order to interview respondent about an alleged sexual assault that had taken place in the bathroom area of Alexander park the previous night. Once there, Erickson met with respondent and respondent's mother. He told them that he was investigating a sex crime. Erickson asked respondent's mother for permission to interview respondent at the police department, and she granted him permission. Erickson explained to her that she could accompany respondent for the interview, but she declined, telling Erickson to "just take him."

¶ 5     Erickson testified that he and respondent made small talk on the way to the police department. He did not testify as to what type of vehicle he drove, where respondent sat in the vehicle, or whether respondent was restrained in any way. Erickson testified that though he did not place respondent under arrest, he believed he had probable cause to do so at that point. Once at the police department, Erickson asked respondent's permission to record the interview, then activated the recording device. Erickson testified that he "[a]dvised [respondent] that he was there on his own accord and also advised him of his *Miranda* rights." The recording of Erickson's interview with respondent was then played in open court.

¶ 6     The video recording begins with Erickson—who appears to be the only other person in the interrogation room—telling respondent: "Okay [respondent], I want you to understand something, okay. You came out to the police department with me willingly today, correct? Like, I didn't tell you you had to come, okay?" Respondent nods as Erickson is speaking. "You understand that you're free to leave, okay. If you don't want to talk to me, you don't have to talk to me. You remember how we got in here, okay? Just—at any time if you don't want to talk to me—if I ask you a question you don't want to answer, you don't have to answer it." Respondent continues to nod along, repeating "yeah" on occasion as Erickson speaks.

¶ 7    Erickson then explains to respondent that he is going to read him his *Miranda* rights, which Erickson describes to respondent as "a statement of [his] constitutional rights." Erickson sets a piece of paper and pen on the table in front of respondent and states:

> "You're not under arrest, okay? I want you to understand that, okay? I'm just asking you some questions. You have the right to remain silent. You understand what that means, okay? [Respondent nods his head rapidly]. Like I said, you don't have to answer all my questions. Could I just have you put your initials right here by number one, saying you understand that? [Erickson points to paper.] Not saying that—"

Respondent then looks up at Erickson, cutting him off midsentence to ask: "In cursive, or—?" to which Erickson replies: "However you want to sign your initials, bud." Respondent then signs his whole name, while Erickson tells him: "You don't have to write your whole name, just your initials."

¶ 8    Erickson then continues through the list of rights, reading each right a second time in slightly different words. For example, Erickson states: "Anything you say may be used against you. Okay, so anything you say could be used against you in court. You understand that? Okay." Respondent nods his head rapidly as Erickson asks if he understands. Respondent continues to nod in agreement each time Erickson reads and rereads a right. Finally, Erickson reads: "I understand what my rights are and am willing to talk. Is that true? I mean are you willing to talk to me?" Respondent nods affirmatively, at which point Erickson sets the pen down and says "Okay, go ahead and sign your name on that right there for me if you would please." Erickson explains again: "You're not under arrest. You know, if you want to shut this down at any time, feel free to do so." Respondent nods throughout that statement.

¶ 9    Erickson begins the interview by asking open-ended questions, but approximately 10 minutes into the interview he shifts almost exclusively to leading questions. Throughout the interview, Erickson accuses respondent of not being truthful. Respondent denies any misconduct through most of the interview, but his story evolves until he ultimately makes incriminating statements. Early in the interview, respondent mentions that he played on the Special Olympics basketball team at his high school. Erickson makes no response to that statement. At one point in the interview, respondent volunteers that he had twice been to teen court—once for a curfew violation and once for stealing a lawnmower. Throughout the interview, respondent speaks slowly and has a vacant expression on his face. The recording spans a total of 50 minutes, which includes a break in which respondent is given a bottle of water. The actual interview lasts approximately 43 minutes.

¶ 10    Erickson testified that after the interview, he informed respondent that he would be placed under arrest. Erickson notified respondent's mother, who then came to the police department.

¶ 11    The State introduced into evidence the *Miranda* waiver form that respondent is seen signing in the interview video. The form reads: "Before any questions are asked of you, you should know," then lists four rights. Respondent's name is printed in the blank space between the introductory sentence and the rights themselves. Respondent's signature appears at the bottom of the form.

¶ 12    On cross-examination, Erickson elaborated on his training as a juvenile officer. He explained that in his role as a juvenile officer he is tasked with making sure an interviewee understands his or her constitutional rights. Erickson testified that if a person did not understand their rights, he was trained to "explain it in a different way that perhaps they may. The point of the class was that children of younger ages are developmentally different than

adults." Erickson affirmed that these special steps are necessary because children are not as knowledgeable and understanding as adults. He agreed that as a juvenile officer, his duty was to "look out for" the welfare and best interests of the minor.

¶ 13 Erickson testified that he had no contact with respondent prior to meeting him at his house. Nothing in his interactions with respondent during the car ride to the police department provided Erickson with any indication as to respondent's education level or cognitive ability. He did not ask respondent any questions regarding respondent's cognitive abilities or intelligence quotient (IQ) level. Erickson agreed that the manner in which he read the *Miranda* warnings to respondent was the same manner as he would read them to adults of average intelligence. Erickson acknowledged that he read the *Miranda* warnings to respondent "with very little explanation of what they mean."

¶ 14 Erickson testified that respondent's statement regarding the Special Olympics "led [Erickson] to believe that [respondent] had somewhat of diminished cognitive function." Erickson did not ask respondent about his cognitive impairment because he didn't "know that [respondent] would have been able to answer that question." Erickson testified that knowing an interviewee to be in the "extremely low range in regards to mental abilities" would not affect the way he read *Miranda* warnings to that person and that he would read the rights to that person in the same way he would to any adult. On redirect examination, Erickson testified that respondent appeared to be understanding the *Miranda* warnings as Erickson read them.

¶ 15 The State called as its next witness Dr. Patricia Grosskopf, an expert in the field of forensic psychology. She testified that she performed three tests on respondent as a part of a cognitive ability examination: the Weschler Intelligence Scale for Children, Fifth Edition, Integrated (WISC-V); the Bender Gestalt II Perception Test (Bender Test); and the Trail Making Test Part A and B (Trails Test).

¶ 16 Grosskopf testified that respondent scored a 70 on the WISC-V, indicative of "extremely low intellectual function." She characterized the score as an IQ of 70. Following her examination of respondent, Grosskopf filed a report, which was entered into evidence. The report clarified that respondent scored in the second percentile on the WISC-V, meaning that he performed better than approximately 2 out of 100 peers. His score on the verbal comprehension index, which measured his "ability to use word knowledge, verbalize meaningful concepts, and reason with language-based information," was in the tenth percentile, or the low-average range. Respondent's score on the fluid reasoning index, which measured his "logical thinking skills and his ability to use reasoning to apply rules," was in the 0.1 percentile, or the extremely low range. Respondent's weakest area of performance was the working memory index, which measured his "attending, concentration, and mental control." In summary, the report concluded, in part, that respondent "present[ed] with limited concentration and although he may present as focused, internally he is not." For treatment, Grosskopf recommended: "Having [respondent] relay back information to assure that he is on task will be imperative for success. This should be consistently done, as [respondent] can give the impression he is focused, when in fact he is not." Grosskopf also recommended: "Information presented to [respondent] should be done so clearly, repetitively, and consistently."

¶ 17 Grosskopf testified that the Bender Test and Trails Test measure executive function. Respondent scored in the normal range on those tests, indicating no impairment in executive functioning. Grosskopf explained that executive functioning controls "[t]he ability to plan and

the ability to have or understand consequences to behavior." Grosskopf's report described the Bender Test as follows:

> "[The Bender Test] is *** used to evaluate visual-motor functioning and visual perception skills ***. Scores on the test are used to identify possible organic brain damage and the degree maturation [*sic*] of the nervous system. The [Bender Test] is used to evaluate visual maturity, visual motor integration skills, style of responding, and reaction to frustration, ability to correct mistakes, planning and organizational skills, and motivation."

The same report described the Trails Test as follows:

> "The [Trails Test] is a neuropsychological test of visual attention and task switching. It consists of two parts in which the individual is instructed to connect a set of 25 dots as fast as possible, while still maintaining accuracy. It can provide information about visual search speed, scanning, speed of processing, mental flexibility, as well as executive functioning. It is also sensitive to detecting several cognitive impairments."

The report indicated that respondent's time fell "within an acceptable range."

¶ 18    When asked if she had an opinion regarding respondent's ability to understand his *Miranda* rights, Grosskopf responded: "I don't have the ability nor would I want to say if, during that interview [with Erickson], he would understand it." Later, she said that she had not asked respondent about the *Miranda* warnings.

¶ 19    Grosskopf testified that she examined respondent over the course of nine hours and that "he had no problem comprehending" the testing. Based on her interaction with respondent, Grosskopf did not believe that respondent would automatically respond in agreement to a question that suggested the answer. Grosskopf testified that respondent did well on reading comprehension and that he would ask questions if he did not understand something. She opined that respondent would have understood the questions Erickson asked during the interview. Grosskopf testified that she "couldn't give [respondent] a diagnosis of mental—well, mental retardation is the old terminology, but impaired extreme functioning." Nothing from her examination of respondent or her review of Erickson's interview led Grosskopf to believe that respondent's statements were not made voluntarily, knowingly, or intelligently.

¶ 20    At the conclusion of the State's case-in-chief, respondent moved for a judgment in his favor. The trial court denied respondent's motion.

¶ 21    Respondent called as his first witness Andrew Puck, a driver's education teacher at Princeton High School and respondent's Special Olympics basketball coach for three years. Puck testified that he had given respondent driving lessons the previous spring. Respondent was in a separate class for "adaptive special needs kids" with a different instructor, however Puck was respondent's instructor for the in-car lessons. Puck testified that he was unable to complete the required six hours of driving with respondent in the spring "because of [respondent] not functioning at a higher level." They had planned to resume lessons in the fall.

¶ 22    Puck explained why respondent had difficulties in his driving lessons:

> "With [respondent], there are a lot of disconnects. And *** it has always been typical of [respondent] to where we would visit something, whether it is basketball or, you know, driving, and yes, yes, yes; I got it, coach; I got it. And 30 seconds later we are having to revisit that again."

Puck further described respondent's struggles as "information overload to where we would have to really make things as simple as possible." Puck described respondent as "a people pleaser," testifying that respondent would "say whatever he possibly [could] to please you." Puck testified that respondent tended to have a deference to authority figures and a short attention span.

¶ 23 Puck had the opportunity to review the video recording of Erickson's interview with respondent. Puck opined that respondent did not understand what Erickson meant by the right to counsel. He also opined that respondent did not understand when Erickson told him that anything he said could be used against him in court. Puck opined that respondent did not understand what Erickson meant when he told respondent that a lawyer would be appointed if he could not afford one.

¶ 24 On cross-examination, Puck testified that he did not have a background in psychology. He testified that respondent was "more responsive" in one-on-one situations. He agreed that outside stimuli also affected respondent's ability to understand driving lessons. Ultimately, however, respondent's understanding was most affected by his mood on any given day. Puck agreed that to understand whether or not respondent actually understood Erickson, he would have to know what kind of day respondent was having.

¶ 25 Respondent's next witness was Audrie Lundquist, a speech pathologist at Princeton High School. The court qualified Lundquist as an expert in speech pathology. Lundquist testified that she provided respondent with individual therapy sessions in speech and language at the high school. She met with respondent on a weekly basis.

¶ 26 Lundquist testified that she administered an expressive vocabulary test to respondent when he was 15 years old. In the test, respondent was shown a picture and tasked with giving a word for that picture. Respondent scored in the 0.1 percentile on the test, equivalent to a child aged seven years and five months. Lundquist also administered the Peabody Picture Vocabulary test, which measured respondent's understanding of a word. Respondent's results on this test placed him at an age level of 10 years and 9 months. Lundquist performed a third examination, testing "[h]ow [respondent] understands language when it is presented to him." On a scale of 0 to 150 on that test, respondent scored a 65. Lundquist testified that "[t]he normal range" was between 85 and 115.

¶ 27 Lundquist testified that multiple-step instructions were difficult for respondent and that repetition was helpful for him. Lundquist also found it helpful to have respondent repeat back instructions in his own words.

¶ 28 Lundquist had the opportunity to review the video recording of respondent's interview with Erickson. She opined that respondent would understand the sentence "you have the right to remain silent" but would not be able to apply his understanding. "That's the difference there where [respondent] understands the sentence because he has heard it over and over again; we all have. But to not—if he asks a question, for him to think I don't have to answer that, he wouldn't be able to act on that." Lundquist further opined that respondent did not knowingly, intelligently, and voluntarily waive his right to have a lawyer appointed for him. She offered that the only word respondent would have understood was the word "free."

¶ 29 On cross-examination, Lundquist elaborated on the distinction between understanding the words in a sentence and being able to apply the concept. She explained that the speech and language component was distinct from the ensuing cognitive functions. Lundquist admitted that she did not perform cognitive tests and that she did not rely upon them in her own testing.

She admitted that respondent's cognitive ability could impact her previous answers regarding respondent's understanding of the *Miranda* warnings. Lundquist performed her testing from mid-November to early December 2013, approximately 21 months prior to the incident in question. She would not expect respondent's scores to decrease but allowed that scores can improve over time. Her last contact with respondent was in May 2015 for approximately 30 minutes per week.

¶ 30    Upon examination from the trial court, Lundquist testified that respondent scored an 83 on a receptive vocabulary test, which was considered a strength for respondent because it was just two points shy of the low-normal threshold of 85. Lundquist explained that that test measured respondent's strengths with individual words but that language as a whole was more complicated. When asked by the trial court to put her testimony in the context of the *Miranda* warnings, Lundquist explained that respondent would understand each word in "you have the right to remain silent" but that he likely did not fully understand the concept.

¶ 31    Respondent next called Patricia Marquis, a special needs teacher at Princeton High School. She was respondent's case manager and interacted with him on a daily basis, both before and after school. She also saw him every other day in personal communication and American history skills classes. She also spent some lunch periods with him. Marquis testified that his reading and math abilities were higher than some students in the special education classroom, but his ability to concentrate was lower than many students in that classroom.

¶ 32    With regard to instructing respondent, Marquis testified that respondent "needs to be redirected quite often because his attention span is very short and limited." Marquis testified that she would ask respondent to explain in his own words what they had been discussing. She would also ask him to break things down into steps.

¶ 33    Marquis testified that respondent had previously indicated he understood instructions when he actually did not. Marquis explained that this tendency was due to respondent's desire to please people. She went on to testify that "you have to further query him about, you know, what you are asking to make sure that he understands it." Marquis observed that respondent would "shake his head yes" to indicate he understood something when he actually did not understand. She expounded:

> "And then I would have to—then I would often times ask him a little bit more to make sure, because a head shake to me doesn't indicate to me that he understands the material. So I would ask him further or a little more deeply, you know, what he does know or what he doesn't know to answer the question."

Marquis testified that respondent "reads much better than he understands what he is reading *** . He reads the words much better than really comprehending what they mean."

¶ 34    Marquis had also reviewed the recording of the interview between respondent and Erickson. She believed that respondent did not understand all of the questions Erickson asked. Marquis opined that respondent would understand the words in you have "the right to remain silent." She continued: "Whether he understands the broad scope of all of it, I'm not sure about that." Marquis elaborated:

> "He knows the definition of a word. He knows the vocabulary of the word, but then how that affects him or how that—the understanding of what he is saying, I'm not sure that he would have understood all of that, if that is clear. He knows what a word means but not necessarily what the whole scope of it would mean to him."

¶ 35    When asked whether respondent would understand what the right to an attorney meant, Marquis responded: "He knows what the word right means. He knows what the word attorney means. But I'm not sure he would understand the language of all of that, what that really means to him." She testified similarly as to respondent's right to have counsel appointed for him. She did not believe respondent would understand the word "waiver" or what it meant to waive his rights. Marquis testified that she would have asked respondent more follow-up questions had she been in Erickson's shoes. She admitted that she knew to ask more questions from her three years of knowing respondent. She knew that respondent's first answer is frequently incorrect and merely his attempt to tell her what he thinks she wants to hear.

¶ 36    In watching the video recording, Marquis observed that respondent was trying to please Erickson by providing the answers Erickson sought. She also noted that the evolution of respondent's answers over the course of the interview was similar to her own experiences with respondent when he was in trouble. She testified: "It is a process you go through with him to get to the real truth ***."

¶ 37    On cross-examination, Marquis testified that she had seen improvement from respondent over the previous two years. Marquis agreed that respondent would know what was meant by "you are free to go home." Marquis testified that respondent would benefit from being told something while being shown the same thing contemporaneously. She reiterated that she did not believe respondent understood the things Erickson said to him in the video. Marquis agreed that outside distractions would also impair respondent's understanding.

¶ 38    On redirect examination, Marquis testified that reading comprehension was one of respondent's areas of deficit. She testified that each of respondent's classes at Princeton High School was a special needs class.

¶ 39    Respondent's final witness was Paul Muskopf, who the trial court qualified as an expert in school psychology. Muskopf had taken part in respondent's most recent 3-year reevaluation in February 2014, approximately 19 months before the incident in question. Muskopf had reviewed the video recording of respondent's interview with Erickson. He testified that respondent would likely have understood the words "you have the right to remain silent," but he believed that "it would be hard for [respondent] to understand the implications of waiving, or whatever action he took on *Miranda* rights, that he would understand the implications of doing that."

¶ 40    In regard to the warning "anything you say may be use against you," Muskopf again opined that respondent likely understood the words, but not how they applied to him. When asked if respondent would have been capable of knowingly and voluntarily waiving that right, Muskopf responded: "I think it's possible that [respondent] may have understood them, but I think there's a greater probability that he would have not understood, when he waived those rights, what that implied." Muskopf's testimony was similar in regard to respondent's right to have an attorney present. Muskopf did opine, however, that respondent would understand the words and application of a lawyer being provided for free.

¶ 41    In regard to his 2014 evaluation of respondent, Muskopf testified that respondent's basic reading skills—what Muskopf described as "his ability to look at words and be able to pronounce and sound the words out"—was at approximately a ninth grade level, a level higher than Muskopf had anticipated. Respondent's reading comprehension, however, was at a fourth grade level. Muskopf could not opine on respondent's ability to understand what was told to him verbally and suggested Lundquist would have a better understanding of respondent's

expressive language skills. Muskopf's testing indicated that on November 25, 2013, respondent had a full-scale IQ of 68. A similar test administered two years earlier—when respondent was 12 years and 4 months old—yielded an IQ score of 58 for respondent, which, according to Muskopf, "would be considered a moderate rate of mental retardation."

¶ 42 On cross-examination, Muskopf testified that the 10-point difference between the two earlier IQ tests fell "within [the] range of confidence." He testified that IQ scores do change over time and that such scores are less reliable the younger a person is. He also testified that "it's difficult for [respondent] oftentimes to follow a conversation and to give an appropriate answer."

¶ 43 Following arguments, the trial court found that respondent was not in custody during his interview with Erickson and that Erickson was therefore not required to deliver the *Miranda* warnings. In support of this conclusion, the trial court relied primarily on the fact that respondent had been told repeatedly that he was free to leave. The court also pointed out that respondent had never been handcuffed or restrained in any way, Erickson had never drawn or brandished a weapon, and there was apparently only one officer interrogating respondent. The court further noted that there had been no formal indicia of arrest, such as fingerprinting or booking. The court also found it relevant that respondent "wasn't inexperienced with the police," referencing respondent's two experiences with teen court. Though Erickson had delivered *Miranda* warnings, the court commented that law enforcement should be encouraged to provide the *Miranda* warnings whether a suspect is in custody or not, opining that such a tactic was "better safe than sorry." The court further found that there was no indication of any sort of coercion on Erickson's part and that respondent's statements were purely voluntary.

¶ 44 The court proceeded to find that even if respondent was in custody such that the *Miranda* warnings would be required, those warnings were properly delivered, and respondent knowingly and intelligently waived the rights therein. The court repeatedly acknowledged that respondent had a diminished capacity, at one point stating: "There is a limited intellectual ability, there's no doubt about it." The court further acknowledged that "there was an absence of a parent or other concerned adult" at respondent's interview. This included a deprivation of the presence of a juvenile officer, as Erickson could not serve as interrogator and juvenile officer simultaneously. The court found that these factors, however, were outweighed by a number of other factors that suggested respondent's waiver was knowing and voluntary. In particular, the trial court found that Erickson's delivery of the *Miranda* warnings was more than satisfactory. The court stated that the information in the warnings "was presented clearly and repetitively and consistently. And there were clear guidelines and consequences conveyed ***." Moreover, the court found that Erickson "took great care" in advising respondent of his rights. The court commented that Erickson "went considerably farther than just a mere ritualistic recital of the *Miranda* warnings."

¶ 45 In regard to respondent's diminished capacity, the court found that the factors of age and intelligence "weigh in favor of both sides." The court stated:

"[Grosskopf] testified that his learning disability did not appear to significantly affect his functional communication skills.

We have some conflicting evidence on that point, but I am most persuaded ultimately that it did not appear to significantly affect his functioning communication skills insofar as ability to understand and waive *Miranda* and make a voluntary statement."

- 9 -

¶ 46    The court also put great emphasis on the video recording of the interview, finding the suggestion that respondent did not understand his rights was belied by the video. The court found that respondent appeared relatively calm, "appear[ed] to understand the situation," and was able to provide clear answers to Erickson's questions. The court found that respondent's repeated nods "constituted a full acknowledgment of his rights in context." On that point, the court noted: "[H]e is nodding emphatically, as he always does when it's clear that he understands what is going on." Further, the court stated: "I saw a kid in that video that was very focused. He was with Officer Erickson every step of the way."

¶ 47    The court also discussed respondent's experience with teen court as well as its finding that respondent possessed "street smarts." Though the court acknowledged that "[t]here [was] no evidence that [respondent] has ever been exposed to *Miranda* warnings before, and I don't assume he was just because he was arrested because there would have to be evidence of that," it nevertheless referenced respondent's teen court experiences and his "street smarts" no fewer than 10 times in delivering its ruling. In going through each *Miranda* right, and discussing whether respondent would have understood how they applied to him, the court repeated twice: "we have the teen court experience."

¶ 48    With respect to the witnesses at the hearing, the court found that the tests performed by Grosskopf, on balance, "support[ed] the State's position." In particular, the court pointed out that respondent's executive functioning and verbal comprehension were among his highest scores. The court noted that respondent "has difficulty with maintaining focus, listening and processing what others are saying to him," but found that respondent was focused in the interview, crediting this in part to respondent's "street smarts." The court also gave weight to Erickson's opinion that respondent had understood the *Miranda* warnings, finding that Erickson was "in a position to give his opinion, just like everybody else was."

¶ 49    The court described respondent's witnesses as "[a] long list of very impressive witnesses, good people, solid citizens, excellent in their job, heartfelt observations." Referencing Puck's testimony that respondent could lose focus as conversations wear on, the court pointed out that the *Miranda* warnings were delivered at the beginning of the interview. In regard to Lundquist's testimony, the court found that Lundquist's tests had been performed in 2013 and that two years is "a long, long time *** in the life of a 17-year-old, in terms of intellectual capacity, development, experience, learning." In regard to Marquis' testimony that respondent benefitted from repetition and from having things broken down for him, the court found that Erickson had done just that. The court pointed out again that respondent was focused "like a laser beam" during the interview. The court also noted that Marquis had testified that respondent was stronger with verbal instruction, and that he benefitted from one-on-one interactions with minimal distractions. The court found Erickson's delivery of the *Miranda* warnings comported with these conditions.

¶ 50    The matter proceeded to a bench trial on December 14, 2015. Witnesses at trial included the alleged victim, as well as respondent testifying in his own defense. The parties stipulated to the video recording, as well as Erickson's testimony. Regarding his *Miranda* rights, respondent testified that he did not understand what "anything he said could be used against him" meant. When asked what about that right he did not understand, respondent replied, "[t]he right of it." Respondent also described a lawyer as "[s]omeone who works for the State." Respondent testified that he did not have a right to have a lawyer with him during Erickson's interrogation and only had the right to a lawyer afterwards. He further testified: "I didn't really

understand the part of that, like, you say intelligently and knowingly waive your rights." On cross-examination, respondent testified: "I didn't know that I didn't have to answer [Erickson's] questions and that."

¶ 51 The court found respondent guilty of criminal sexual assault and adjudicated him delinquent. On January 25, 2015, the court sentenced respondent to the Department of Juvenile Justice for a term not to exceed 15 years or his 21st birthday, whichever comes first. Respondent's motion to reconsider sentence was denied.

¶ 52                                    ANALYSIS

¶ 53 Respondent argues that the trial court erred in finding that he was not in custody during his interview and that *Miranda* warnings were therefore required. In turn, respondent argues that he did not knowingly and intelligently waive his *Miranda* rights. We find that respondent was in custody for fifth amendment purposes and that he did not knowingly and intelligently waive his *Miranda* rights.

¶ 54 In *Miranda v. Arizona*, the United States Supreme Court held that a person being questioned by law enforcement must first be advised "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444. The *Miranda* court further held that a "defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." *Id*.

¶ 55 In *Miranda*, the Supreme Court held that advisement of one's rights was only mandated in circumstances of custodial interrogation or "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id*. In other words, where there is no custodial interrogation, neither the *Miranda* warnings nor knowing and intelligent waiver of the *Miranda* rights are mandated. See *People v. Slater*, 228 Ill. 2d 137, 159 (2008). Accordingly our analysis must begin with a determination as to whether respondent was in custody when he was interrogated by Erickson.

¶ 56                                    I. Custody

¶ 57 In determining whether a person was in custody for *Miranda* purposes, a reviewing court must determine whether, given the circumstances of interrogation, " 'a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.' " *People v. Braggs*, 209 Ill. 2d 492, 506 (2003) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). Our supreme court has found that the proper test for such an inquiry is "what a reasonable person, innocent of any crime, would have thought had he or she been in the defendant's shoes." *Id*. Though the question of whether respondent was in custody is technically intermediate to the ultimate question of whether suppression is warranted, we review the issue *de novo* as a mixed question of law and fact. See *id*.

¶ 58 Factors relevant to determining whether statements were made in a custodial setting include:

> "(1) the location, time, length, mood, and mode of the questioning; (2) the number of police officers present during the interrogation; (3) the presence or absence of family and friends of the individual; (4) any indicia of a formal arrest procedure, such as the show of weapons or force, physical restraint, booking or fingerprinting; (5) the manner

by which the individual arrived at the place of questioning; and (6) the age, intelligence, and mental makeup of the accused." *Slater*, 228 Ill. 2d at 150.

Our supreme court has also found the reading of the *Miranda* warnings to be a factor relevant to a custody analysis, noting that the warnings "might be perceived by a suspect as an indication that he is under arrest." *People v. Melock*, 149 Ill. 2d 423, 438 (1992). Moreover, the United States Supreme Court has found that the interrogating officer's subjective beliefs of the suspect's guilt, if disclosed to the suspect, can be indicative of custody. *Stansbury v. California*, 511 U.S. 318, 324-25 (1994); see also *People v. Brown*, 136 Ill. 2d 116, 125 (1990) (listing "the extent of knowledge of the officers and the focus of their investigation" as a factor relevant to custody inquiry).

¶ 59    In *Braggs*, our supreme court clarified that the reasonable person standard for custody inquiries must take into account the age and mental capabilities of the person being questioned. *Braggs*, 209 Ill. 2d at 507-09. The *Braggs* court reasoned that the factors of age, intelligence, and mental makeup are "analytically intertwined" with the reasonable person standard. *Id.* at 507. As the court stated, in pertinent part:

> "If *** we are concerned with what a reasonable person 'in the defendant's shoes' [citation] would have thought about his or her freedom of action, the reasonable person we envision must at least wear comparable footwear; otherwise, we ought to simply abandon the legal charade that the defendant's characteristics, perspective and perception matter at all." *Id.* at 508 (quoting *People v. Lucas*, 132 Ill. 2d 399, 418 (1989)).

¶ 60    The *Braggs* court first expounded on this reasoning in regard to the age of a defendant. *Id.* at 508-09. The court began by pointing out "the now firmly established legal principle" that juvenile defendants are generally more susceptible to police coercion and that this susceptibility must be taken into account when establishing procedural safeguards attendant to custodial interrogation. *Id.* at 509; see, *e.g.*, *Haley v. Ohio*, 332 U.S. 596, 599 (1948). Relying on the Ninth Circuit case of *Alvarado v. Hickman*, 316 F.3d 841 (9th Cir. 2002), the *Braggs* court found that this logic extended to the initial custody analysis: " 'If a juvenile is more susceptible to police coercion during a custodial interrogation, then the same juvenile is also more susceptible to the impression that he is, in fact, in custody in the first instance.' " *Braggs*, 209 Ill. 2d at 509 (quoting *Alvarado*, 316 F.3d at 843[1]).

¶ 61    The *Braggs* court found that the above reasoning extended with equal force to defendants with mental impairments. *Id.* at 510. The court declared: "The same rationale that requires modification of the reasonable person standard to take into account the general characteristics

_____

[1]After our supreme court issued its decision in *Braggs*, the United States Supreme Court reversed the Ninth Circuit's decision in *Alvarado*, finding that "[the Supreme Court's] opinions applying the *Miranda* custody test have not mentioned the suspect's age, much less mandated its consideration." *Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004). The precise ground for reversal in that case was that the *habeas* court had extended a rationale, rather than applying a clearly established legal principle, in violation of federal statute. *Id.* at 666-67. In any event, the Illinois Supreme Court has consistently found—both before and after the Supreme Court's decision in *Alvarado*—that age, intelligence, and mental makeup are factors to be considered in the custody analysis. *E.g.*, *Lucas*, 132 Ill. 2d at 417; *Slater*, 228 Ill. 2d at 150; see also *California v. Ramos*, 463 U.S. 992, 1013-14 (1983) ("It is elementary that States are free to provide greater protections in their criminal justice system than the Federal Constitution requires.").

of juveniles also militates in favor of such a modification where the mentally retarded are concerned." *Id.* In other words, just as the mentally impaired are more susceptible to police coercion, they are more susceptible to the impression that they are in custody. *Id.* at 511.

¶ 62 Under the circumstances of Erickson's interrogation of respondent, a reasonable person of respondent's age and mental capabilities would not have felt free to terminate the interrogation and leave. In reaching this conclusion, we recognize that Erickson testified that respondent was not formally placed under arrest and that Erickson repeatedly told respondent before the interrogation that he was free to leave at any time. An officer's informing a defendant that he is free to leave, however, is only one factor in our analysis. See, *e.g.*, *People v. Smith*, 150 Ill. App. 3d 524, 526 (1986) (defendant found to be in custody despite officer's repeated warnings that she was not under arrest and was free to leave). In the present case, the many factors weighing in favor of custody contradict Erickson's statements.

¶ 63 The interrogation here took place in a small room at the Princeton police department in the middle of the day. The interrogation lasted approximately 43 minutes. The testimony presented at the suppression hearing regarding respondent's inability to focus suggests that this comparatively short time period likely had a unique effect upon respondent. More importantly, the substance and mode of Erickson's questions surely indicated to respondent that Erickson was not merely searching for more information but that respondent was Erickson's one and only suspect. See *Braggs*, 209 Ill. 2d at 512 ("[E]ven a mentally retarded suspect might well have regarded herself as [a suspect] after [the officer] had expressed disbelief of her version of events and had asked her to take a polygraph examination."). Erickson repeatedly and consistently expressed his disbelief in respondent's version of events until respondent subsequently changed his declaration of innocence to agree with Erickson's version of events.

¶ 64 Also Erickson drove respondent from respondent's home to the police department. Though no evidence was presented regarding the type of car Erickson drove, or whether respondent sat in the front or backseat of that car, Erickson was respondent's transportation. Though Erickson assured respondent that he was free to get up and leave at any point, it is unclear where respondent could go or how he would get there.

¶ 65 Further, though respondent was not subjected to such formal indicia of arrest as booking or fingerprinting, he was read his *Miranda* rights. While the trial court suggested that a "better safe than sorry" approach is ideal when it comes to the *Miranda* warnings, it is well-settled that the reading of the warnings is itself an indicator of custody. See *Melock*, 149 Ill. 2d at 438. This factor should apply with even greater force where the suspect is a juvenile with cognitive impairments. In such cases, years of cultural exposure to the *Miranda* rights being read contemporaneously to an arrest are more likely to undermine the officer's own declaration that the suspect actually was not under arrest.

¶ 66 It is also notable that respondent was not accompanied by a concerned adult at any point, either on the ride to the police department or during the interrogation. Though the State points out that respondent's mother declined an invitation to accompany respondent at the interrogation, neither the invitation nor the mother's seeming indifference are probative as to whether respondent felt free to leave the interrogation room. We find this factor particularly compelling here, as a juvenile with cognitive impairments could surely have benefitted from a concerned adult equipped to explain the situation to respondent. *Cf. Braggs*, 209 Ill. 2d at 511-12 (finding custody even where mentally impaired suspect was accompanied by a

- 13 -

concerned adult who "acted as a translator of sorts and actually facilitated the police interrogation").

¶ 67 Finally, respondent's age, intelligence, and mental makeup in general indicate that a reasonable person of those attributes would not have felt free to leave the interrogation room. At age 17, respondent, of course, "is on the older end of the juvenile scale." *People v. Murdock*, 2012 IL 112362, ¶ 44. His age, however, must be considered in light of his intelligence and mental capabilities. To this point, the trial court found that "[t]here is a limited intellectual capacity, there's no doubt about it." The record overwhelmingly supports this finding. Respondent's IQ was most recently measured to be 70, and it was measured to be 68 less than two years earlier. Respondent's scores on the individual sections of the WISC-V were consistently in the extremely low percentiles. Each of his classes at Princeton High School was a special needs class, and he played on the Special Olympics basketball team. Moreover, the video recording of the interrogation shows respondent laboring under some sort of cognitive impairment. See *infra* ¶ 86.

¶ 68 Considering respondent's intellectual limitations along with the factors listed above, we find that respondent was subjected to a custodial interrogation and that the *Miranda* warnings were therefore required. See *Slater*, 228 Ill. 2d at 159.

¶ 69 II. Knowing and Intelligent Waiver of *Miranda* Rights

¶ 70 A defendant's incriminating statements will be deemed inadmissible at trial unless the State proves by a preponderance of the evidence that the defendant validly waived his *Miranda* rights. *In re W.C.*, 167 Ill. 2d 307, 327 (1995). Our supreme court has explained what constitutes a valid waiver:

> "To be valid, the waiver must reflect an intentional relinquishment or abandonment of a known right or privilege. The accused must possess a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. [Citation.] To waive rights intelligently and knowingly, one must at least understand basically what those rights encompass and minimally what their waiver will entail. The mental state that is necessary to validly waive *Miranda* rights involves being cognizant at all times of the State's intention to use one's statements to secure a conviction and of the fact that one can stand mute and request a lawyer." *Id.* at 327-28.

¶ 71 The obligation of the State to prove that a waiver was knowing and intelligent was described by the *Miranda* court as a "heavy burden." *Miranda*, 384 U.S. at 475. Courts will " 'indulge every reasonable presumption against waiver' of fundamental constitutional rights." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) (quoting *Aetna Insurance Co. v. Kennedy ex rel. Bogash*, 301 U.S. 389, 393 (1937)). "Once the State has established its *prima facie* case, the burden shifts to defendant to show that his waiver was not knowing, intelligent or voluntary." *People v. Reid*, 136 Ill. 2d 27, 51 (1990).

¶ 72 "Whether a waiver is knowing and intelligent is determined by the particular facts and circumstances of the case, 'including the background, experience, and conduct of the accused.' " *Braggs*, 209 Ill. 2d at 515 (quoting *Johnson*, 304 U.S. at 464). It is well-settled that special care must be taken to ensure that a juvenile's *Miranda* waiver is knowing and intelligent. See *People v. Wipfler*, 68 Ill. 2d 158, 171 (1977) ("[S]pecial care must be taken when determining the voluntariness of a minor's waiver of rights."); *Murdock*, 2012 IL 112362, ¶ 24 ("Because defendant was a juvenile, greater care must be taken to ensure that the

- 14 -

statements were not the result of fright, ignorance of rights, or adolescent flights of fantasy."). As the *Braggs* court explained, this "special care" requirement extended to defendants with cognitive impairments:

> "[I]t is generally recognized that the mentally retarded are considered more susceptible to police coercion or pressure than people of normal intellectual ability, they are predisposed to answer questions so as to please the questioner rather than to answer accurately, they are more likely to confess to crimes they did not commit, they tend to be submissive, and they are less likely to understand their rights." *Braggs*, 209 Ill. 2d at 514.

¶ 73    By way of reference, we note that section 1-116 of the Mental Health and Developmental Disabilities Code previously defined mental retardation as "significantly subaverage general intellectual functioning which exists concurrently with impairment in adaptive behavior and which originates before the age of 18 years." 405 ILCS 5/1-116 (West 2010). Effective January 1, 2012, the term "mental retardation" was replaced by the term "intellectual disability," while the definition remained the same. 405 ILCS 5/1-116 (West 2012). Mental retardation has been described as requiring an IQ of less than 70 (see *People v. Daniels*, 391 Ill. App. 3d 750, 754 (2009)) and of less than 75 (see *People v. Jones*, 2014 IL App (1st) 120927, ¶ 59). The *Braggs* court's use of the term "mentally retarded" was referring generally to persons below a range of "normal intellectual ability." *Braggs*, 209 Ill. 2d at 514. In other words, the court gave no indication that, for example, a defendant with an IQ of 69 would require special care while a defendant with an IQ of 71 would not require such care. Thus, while a medical diagnosis of intellectual disability or mental retardation is relevant, it is not strictly necessary to a determination that a defendant's mental makeup warranted special care. In the present case, it is undisputed that respondent suffered from, in the trial court's words, a "limited intellectual capacity." See *supra* ¶ 67.

¶ 74    The overwhelming weight of the evidence in the present case warrants a finding that respondent did not knowingly and intelligently waive his *Miranda* rights. Initially, we note that Erickson provided very little explanation to respondent as to what his rights entailed. With the exception of respondent's right to remain silent, which Erickson repeated in various forms, such as telling respondent he did not have to answer questions, the only explanation Erickson provided was to repeat the warning using slightly different wording. The trial court's finding that Erickson had taken great care and gone beyond a ritualistic recitation, was against the manifest weight of the evidence. See *People v. Hackett*, 2012 IL 111781, ¶ 18 (reversal of a trial court's findings of fact is warranted when those findings are against the manifest weight of the evidence). Indeed, Erickson himself testified that he had delivered the warnings in the same fashion he would to an adult of average intelligence. Erickson agreed that he had read the *Miranda* warnings to respondent "with very little explanation of what they mean," falling short of the "special care" required in taking confessions from juveniles and intellectually impaired individuals. See *Braggs*, 209 Ill. 2d at 514.

¶ 75    Moreover, each of respondent's four witnesses testified in some form that respondent was either unable to understand his *Miranda* rights or unable to understand what waiver of those rights entailed. The trial court commented that those witnesses were "very impressive witnesses, good people, solid citizens, excellent in their job, heartfelt observations."

¶ 76    Puck, who had become acquainted with respondent through the Special Olympics and driver's education, testified that respondent had a tendency to assure him that he understood

something, only for Puck to have to explain it again "30 seconds later." This stemmed from respondent's deference to authority figures as well as his inclination to "say whatever he possibly [could] to please you." Puck had watched the video recording of Erickson's interrogation and opined that respondent would not have understood his rights.

¶ 77    Lundquist, an expert in speech pathology, met with respondent once a week at Princeton High School. When respondent was 15 years old, she administered a test designed to measure "how [respondent] understands language when it is presented to him." Respondent had scored well below "[t]he normal range" on that test. On other vocabulary tests administered by Lundquist at the same time, respondent's scores placed him at an age level of 7 years, 5 months, and 10 years, 9 months. Lundquist also testified that respondent could not have knowingly and intelligently waived his rights, opining that while respondent may have understood certain words, he would not have understood their application, or how to put those rights into effect.

¶ 78    As respondent's special needs case manager, Marquis interacted with him on a daily basis at the high school. She testified that respondent had a short attention span and struggled to concentrate. She had observed that respondent would often indicate he understood instructions when he actually did not, opining that this stemmed from his desire to please people. Specifically, respondent would often "shake his head yes" to indicate understanding when he actually did not understand. Marquis testified that respondent may have understood the words comprising his *Miranda* rights but doubted he could have understood their application or what the rights meant to him.

¶ 79    Finally, Muskopf, the school psychologist, testified that while respondent's basic reading skills were adequate, his ability to comprehend what he was reading lagged far behind. He testified that "it would be hard for [respondent] to understand the implications of waiving, or whatever actions he took on *Miranda* rights, that he would understand the implications of doing that." Muskopf did suggest that respondent might have known what a "free lawyer" meant.

¶ 80    In contrast to the four witnesses who testified that respondent would not have understood his *Miranda* rights, how they applied to him, or what their waiver meant to him, Grosskopf, State's expert, declined to give an opinion on the matter. See *supra* ¶ 18. Grosskopf did testify that respondent scored a 70 on the WISC-V, indicative of "extremely low intellectual function." His score on the verbal comprehension index, which measured his "ability to use word knowledge, verbalize meaningful concepts, and reason with language-based information," was in the tenth percentile, or the low-average range. Respondent's weakest area of performance was the working memory index, which measured his "attending, concentration, and mental control." Grosskopf's report emphasized respondent's inability to concentrate.

¶ 81    Grosskopf did testify that, in her observations, respondent would ask questions if he did not understand something and that he would not automatically agree with something if he did not understand. She opined that the incriminating statements respondent ultimately made to Erickson were given voluntarily, knowingly, and intelligently. She also testified that respondent scored in the normal range on the Bender Test and Trails Test, indicating no impairment in executive functioning.

¶ 82    The trial court emphasized the Bender Test and Trails Test above all others in delivering its ruling. However, the actual description of those tests demonstrate they are far less probative

concerning respondent's cognition and possible understanding of the *Miranda* rights than the WISC-V or the tests performed by Lundquist. The Bender Test and Trails Test—literally tests that require the taker to connect dots—primarily measure physiological characteristics, such as executive functioning, motor skills, and maturation of the nervous system. Though Grosskopf's report noted that the Trails Test "is also sensitive to detecting several cognitive impairments," there was no explanation of what those impairments are, such as how dot-connecting is probative of respondent's ability to understand *Miranda* warnings and their waiver.

¶ 83    In the video recording of Erickson's interrogation, respondent appears consistently dazed and adrift. While he answers most of Erickson's questions, he does not appear altogether present in the interrogation room. An example of respondent's aloofness throughout the interrogation is his response to Erickson's request that he place his initials next to each *Miranda* right to indicate he understands them. Instead, respondent becomes caught up with whether he should print or sign his name, ultimately printing his whole name above the entire paragraph of *Miranda* rights. Moreover, while Erickson reads the *Miranda* warnings, respondent responds each time with the nodding of his head. The court stated: "[H]e is nodding emphatically, as he always does when it's clear that he understands what is going on"; however, this is contradicted by the evidence. As Puck testified, respondent's head nods are indicative of his *not* understanding something. See *Daniels*, 391 Ill. App. 3d at 792 ("[A] defendant's affirmative responses to questions regarding her understanding of *Miranda* warnings are of little value where defendant lacks the ability to understand those warnings.").

¶ 84    Further, the court's references to respondent's "laser beam" focus is also contrary to the manifest weight of the evidence. Not only does the video recording itself belie the court's conclusion but every witness to testify at the hearing, except for Erickson, testified to respondent's short attention span and his inability to concentrate.

¶ 85    Finally, while previous exposure to the criminal justice system has been deemed relevant to a determination of whether a defendant understood his rights (see, *e.g.*, *Reid*, 136 Ill. 2d at 58), this factor does not militate in the State's favor in this case. As the trial court aptly pointed out, respondent's two experiences in teen court provide no evidence as to whether or not respondent had ever been read his *Miranda* rights before. Of course, even if respondent had been read those rights before, that "in no way means that he understood what was read to him." *In re J.M.*, 2014 IL App (5th) 120196, ¶ 35.

¶ 86    The totality of the circumstances indicate that respondent did not understand his *Miranda* rights, nor did he comprehend what their waiver would entail. No special care was taken to ensure that respondent, an intellectually impaired juvenile, understood the nature of the rights or the consequences of waiving them. Accordingly, respondent could not have knowingly and intelligently waived those rights, and the incriminating statements he made while in custodial interrogation are inadmissible. See *W.C.*, 167 Ill. 2d at 327.

¶ 87    We do not find that the admission of respondent's incriminating statement was harmless. See *People v. St. Pierre*, 122 Ill. 2d 95, 114 (1988) ("Confessions carry 'extreme probative weight,' and therefore the admission of an unlawfully obtained confession rarely is harmless error."); *People v. R.C.*, 108 Ill. 2d 349, 356 (1985) ("[A] confession is the most powerful piece of evidence the State can offer, and its effect on a [trier of fact] is incalculable."). Indeed, the State does not argue that any error was harmless beyond a reasonable doubt.

¶ 88    Accordingly, we vacate the trial court's adjudication of delinquency, reverse its ruling on the motion to suppress respondent's confession, and remand for further proceedings.

¶ 89                                    CONCLUSION

¶ 90    The judgment of the circuit court of Bureau County is vacated in part, reversed in part, and remanded for further proceedings.

¶ 91    Vacated in part and reversed in part.

¶ 92    Cause remanded.