# Illinois Official Reports

## Appellate Court

---

**People v. Wilson, 2020 IL App (1st) 162430**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BOBBY WILSON, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>No. 1-16-2430 |
| Filed | March 26, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-CR-1026; the Hon. Thomas Joseph Hennelly, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, Lauren A. Bauser, and Adrienne E. Sloan, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Clare Wesolik Connolly, and Hareena Meghani-Wakely, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE BURKE delivered the judgment of the court, with opinion.<br>Presiding Justice Gordon and Justice Lampkin concurred in the judgment and opinion. |

**OPINION**

¶ 1    Following a jury trial, defendant, Bobby Wilson, was found guilty of first degree murder based on a theory of accountability for actions that occurred when he was 16 years old. The trial court subsequently sentenced him to 37 years' imprisonment. On appeal, defendant contends that (1) the trial court erred by denying his motion to suppress statements made to the police where he lacked the ability to understand his *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436 (1966)), (2) the State failed to present sufficient evidence to prove his guilt based on a theory of accountability, (3) the trial court denied him a fair trial when it refused to provide the jury with an instruction on the concept of mere presence after the jury submitted a question during deliberations that allegedly demonstrated its confusion about the law of accountability, (4) he must receive a new sentencing hearing where the trial court failed to consider all of the statutory mitigating factors for juvenile offenders, and (5) his sentence was unconstitutional.

¶ 2    Because we find that defendant lacked the ability to understand his *Miranda* rights and therefore could not knowingly and intelligently waive those rights, the trial court should have suppressed his statements to the police. We further find the error was reversible and there was insufficient evidence to convict him such that retrial would offend double jeopardy principles. Accordingly, we reverse defendant's conviction outright.

¶ 3                                    I. BACKGROUND

¶ 4    A grand jury indicted defendant with multiple counts related to the October 24, 2012, shooting death of Kenton Morgan. The State ultimately proceeded to trial on four counts of first degree murder. In count I, the State alleged that defendant intended or knowingly shot and killed Morgan while armed with a firearm. In count II, the State alleged that defendant shot and killed Morgan while armed with a firearm, knowing that such an act created a strong probability of death or great bodily harm. In counts III and IV, the State alleged that defendant shot and killed Morgan while armed with a firearm during the commission of an armed robbery and vehicular invasion, respectively.

¶ 5                                 A. Motion to Suppress

¶ 6    Before trial, defendant filed a motion suppress his statements to the police based on his alleged inability to understand his *Miranda* rights. At a hearing on defendant's motion, the State presented the testimony of Chicago police detective Donald Hill. He testified that, in December 2012, he was investigating the death of Morgan and learned that defendant was in custody at the police station. Because defendant was only 16 years old, the police notified his mother, and she came to the station. According to Detective Hill, neither he nor his partner, Detective John Otto, had any conversation with defendant prior to his mother arriving. Once defendant's mother arrived at the station, the detectives told her that defendant was in custody for an investigation related to a homicide. Defendant's mother did not have any questions. Afterward, defendant's mother and the detectives entered the interview room where defendant was located. According to Detective Hill, defendant was sleeping and not handcuffed when they walked in. The detectives then began their interview with defendant, which was video recorded. The recording was entered into evidence at the suppression hearing.

¶ 7       Detective Hill testified that, initially, he informed defendant that he was being interviewed as a suspect in a homicide investigation that occurred in the vicinity of West 80th Street and South Halsted Street in Chicago. Then Detective Otto began advising defendant of his *Miranda* rights, beginning with his right to remain silent, which defendant stated he understood. Detective Otto next informed defendant that he had the right to an attorney, which defendant stated he understood. Detective Otto did not, however, explicitly inform defendant that he could have an attorney present with him during the current questioning. Detective Otto then asked defendant if he knew that anything he said could and would be used against him in court, which defendant stated he understood. Detective Otto further told defendant that if he could not afford an attorney, one would be provided to him free of charge, but defendant stated he did not understand. Detective Otto explained that this right meant "if you can't afford an attorney, the State will pay for an attorney for you," and defendant responded "uh, all right." Lastly, Detective Otto asked defendant if he understood that he could be charged and prosecuted as an adult in this case, but defendant indicated he did not understand. Detective Otto explained that, even though defendant was a juvenile, if he were charged with murder, he would be charged as an adult. Defendant acknowledged he understood. While Detective Otto informed defendant of his *Miranda* rights, defendant's mother remained silent in the interview room.

¶ 8       The detectives then asked defendant about the shooting death of Morgan. Detective Hill testified that, during the 30-minute interview, defendant appeared to understand all of their questions and he did not have trouble answering them. Initially, defendant denied any knowledge of Morgan's death, but upon further questioning, he discussed what he knew. Later, defendant gave the detectives the name of an individual he observed on the night of October 24, 2012. The detectives and defendant's mother subsequently left the room, so the detectives could try to obtain a photograph of that individual. Approximately 30 minutes later, the detectives and defendant's mother returned to the room. Detective Hill showed defendant a photograph, and he identified the individual. The detectives attempted to ask defendant another question, but his mother interjected and said she had contacted an attorney. After defendant confirmed that he wanted the attorney, the detectives stopped their questioning. During the interview with defendant, Detective Hill was not aware of any learning defects or cognitive issues that defendant might have had. Defendant's mother was present during the entirety of the interview.

¶ 9       Following Detective Hill's testimony, the trial court found that the State had met its burden to show defendant understood his *Miranda* rights and asserted the burden had shifted to defendant to show otherwise.

¶ 10      Defendant then presented the testimony of Dr. Antoinette Kavanaugh, a forensic clinical psychologist, who before starting her own practice had worked for 10 years as the clinical director of the Cook County Juvenile Court Clinic. Based on her credentials, the trial court qualified her as an expert witness. Dr. Kavanaugh testified that, based on a request from defendant's attorney, she conducted an evaluation of defendant for his ability to understand his *Miranda* rights and whether he was able to provide a knowing and intelligent waiver of those rights. In evaluating defendant, Dr. Kavanaugh interviewed him three times for a total of five and a half hours, interviewed his mother for a total of three hours, and watched the video recorded interview of his with the detectives. Dr. Kavanaugh also reviewed various records of defendant's, including his arrest report, his school records, prior psychological reports, and

- 3 -

multiple individualized education programs (IEPs). She explained that IEPs were required by the federal government for students in need of special education services. Dr. Kavanaugh interviewed the paraprofessional who helped manage defendant's current IEP, and he told her that defendant "tends to say he understand[s] things when he doesn't because he wants to appear as cognitively advanced as you would expect a person his age to be." According to Dr. Kavanaugh, if defendant indicated he understood something, that would not necessarily mean he understood it.

¶ 11    Dr. Kavanaugh remarked that defendant had a learning disability and discussed defendant's prior cognitive tests. In third grade, his full-scale IQ was 81, which was classified as "below average"; in sixth grade, his full-scale IQ was 62, which was classified as "[e]xtremely low"; in ninth grade, his full-scale IQ was 70, which was classified as "borderline." According to Dr. Kavanaugh, although the test defendant took in third grade was less reliable than the ones he took in sixth and ninth grade, the tests showed that he "consistently perform[ed] significantly below average." Dr. Kavanaugh also discussed defendant's prior academic achievement tests, which demonstrated a lack of academic advancement between third and ninth grade. In third grade, his reading comprehension was at a first-grade level, and by ninth grade, his reading comprehension only had advanced to a second-grade level. On an academic achievement test that Dr. Kavanaugh administered on defendant herself in November 2013—almost a year after his arrest—his reading comprehension and spelling abilities were at a third-grade level, his math abilities were at a fourth-grade level, and his sentence comprehension was at a fifth-grade level.

¶ 12    Additionally, Dr. Kavanaugh tested defendant's ability to understand *Miranda* rights by asking him various questions related to his interview with the police. Initially, she remarked that there was no evidence that defendant had been given *Miranda* rights before this time, though defendant indicated to her that he had interacted with the police before. With regard to understanding his right to remain silent, defendant stated that he "thought he had the right to be quiet." When pressed by Dr. Kavanaugh as to why he did not remain quiet, defendant explained that he thought "the police would make him talk no matter what." According to defendant, "if the police wanted him to talk, *** he had to." With regard to understanding his right to an attorney, defendant stated that he thought it meant he "could have an attorney at court" but did not know he could have an attorney with him at the police station. Based on Dr. Kavanaugh's review of the video recorded interview, she observed that the detectives never explained to defendant how to assert his right to an attorney. Defendant also told her that he was too scared to ask the detectives to explain his right to an attorney any further. Based on the totality of the evidence, Dr. Kavanaugh opined that defendant was not "able to provide an intelligent waiver of his *Miranda* rights" when interviewed by the detectives in December 2012.

¶ 13    In rebuttal, the State presented the testimony of Dr. Susan Messina, a clinical psychologist in the forensic clinical services division of the circuit court. Based on her credentials, the trial court qualified her as an expert witness. Dr. Messina testified that, based on a court order, she conducted an evaluation of defendant for his ability to understand his *Miranda* rights. In evaluating defendant, Dr. Messina interviewed him two times for about four and a half hours in 2015 when he was 18 years old and watched the video recorded interview with the detectives. She also reviewed various records of his, including his social history, school records, and the report from Dr. Kavanaugh.

¶ 14    Based on her review of school records, Dr. Messina stated that defendant missed 33 days of school and was tardy 39 times between first and eighth grade. She considered this "a significant amount of days to miss school" and noted that both absenteeism and tardiness would impact academic achievement and IQ tests. Dr. Messina reviewed a 2007 psychological report about defendant, and she observed that the report indicated defendant understood right from wrong but would often make poor choices. She acknowledged that, based on a 2009 psychoeducational report, defendant had a learning disability and emotional disability. A psychological report from 2012 further noted that he had a "mild cognitive disability," which Dr. Messina observed was in contrast with a previous cognitive assessment that determined defendant had "borderline intelligence." Dr. Messina remarked that defendant told her that he regularly used marijuana and alcohol prior to his arrest in the instant case, and defendant even acknowledged to her that he was "high" when being questioned by the detectives. Defendant added that he did not believe he talked to them due to his use of marijuana that day. Dr. Messina also noted that, based on defendant's own admissions as well as a search of his records, he had been arrested multiple times in the past. However, she saw no evidence that he had been read his *Miranda* rights previously.

¶ 15    After watching defendant's video recorded interview with the detectives, Dr. Messina observed that he exhibited no evidence of "difficulty understanding the questions," no difficulty "tracking the conversation," and did not show any signs of confusion or cognitive deficits. In Dr. Messina's conversation with defendant about the *Miranda* rights the detectives gave him, he told her that he "wasn't really paying attention" and was more focused on why he was at the police station. Based on the totality of the evidence, Dr. Messina opined that defendant was "capable of comprehending his *Miranda* warnings at the time of his arrest."

¶ 16    Following the testimony and the parties' arguments, the trial court remarked that it had considered all of the evidence presented and highlighted that Dr. Kavanaugh and Dr. Messina had contradictory opinions. However, the court asserted that "what is really dispositive in this case and what I'm basing my decision on," rather than "what the experts said," was observed on the video recording of defendant's interview with the detectives. The court observed that, when Detective Otto informed defendant of his *Miranda* rights, defendant indicated when he did not understand. According to the court, "when someone asks a question about their *Miranda* rights, *** that indicates some cognitive process" and showed that defendant was actively listening. Because defendant did not simply answer yes to every question but rather "asked for further clarification" at times, the court found this evidence of "someone who understands what's going on and wants to know where, exactly, things are going." Lastly, the court pointed out that defendant initially denied knowing anything about the shooting of Morgan but later discussed what he knew. This, according to the court, showed defendant "processing information" and "making rational decisions." The court also noted that there was one report of defendant that indicated he had a cognitive disability, with which Dr. Messina disagreed. The court agreed with Dr. Messina and determined that defendant had a learning disability, not a cognitive disability. The court concluded that defendant fully understood his *Miranda* rights and made a conscious decision to waive them. The court accordingly denied his motion to suppress, and his case proceeded to a jury trial.

In the State's case, the evidence showed that, in October 2012, Morgan wore jewelry every day, including a diamond watch, diamond ring, and earrings. In the evening of October 24, 2012, Morgan got a haircut at a barbershop located on the 8000 block of South Halsted Street in Chicago. According to the owner of the barbershop, Howard Jones, Morgan was wearing earrings and a watch that night. Jones also knew defendant and had known him since he was a little kid. On the night of October 24, Jones never saw defendant at his store or talking to Morgan. After Jones finished cutting Morgan's hair, Morgan left the barbershop.

Russell Buckner was driving on the 8000 block of South Halsted Street around 9:30 p.m. and parked his vehicle on the street near Jones's barbershop. Behind his car, Buckner observed a white vehicle, and as he parked, he thought someone might have exited the vehicle. When Buckner exited his own car, he observed a "struggle" occurring inside the white vehicle. Though he could not actually see any occupants inside the car, the vehicle itself was shaking. Suddenly, Buckner heard one gunshot and a window shatter and then heard another shot. Afterward, Buckner observed a male exit the front driver's side of the vehicle and point a firearm at him before running across the street. Buckner then observed Morgan exit the car from the rear passenger side and collapse on the sidewalk. Subsequently, Buckner observed another male, whom he identified at trial as defendant, exit the car from the front passenger side. Buckner knew defendant from the neighborhood and asked what happened. But defendant was "hysterical," looked "shocked," and was unresponsive. Defendant, who did not have a firearm according to Buckner, left the scene. At trial, Bucker testified that defendant went in a different direction than the man with the firearm, with the gunman going toward 79th Street and defendant toward 81st Street. But the State admitted substantively Buckner's prior statement to an assistant state's attorney, wherein he asserted that defendant left the scene in the same direction as the man with the firearm.

After the shooting, Jones left his barbershop, observed Morgan facedown on the sidewalk, and called 911. The police and paramedics arrived, but Morgan died at the scene. Dr. Adrienne Segovia, a medical examiner, performed Morgan's autopsy and concluded that he died from a gunshot wound to the chest with the manner of death being a homicide. Based on the entrance wound from the bullet, Dr. Segovia found no evidence of "close range fire." At the morgue, Morgan's mother received a piece of the band of Morgan's watch, but the face was missing.

The police immediately began processing the crime scene for forensic evidence. One responding officer observed that Morgan was not wearing any shoes and only had socks on. The officer also noticed that Morgan was wearing a "watch" and had a large square-shaped studded earring on his left ear. The officer observed a matching earring on the ground near the curb adjacent to the front passenger side door of Morgan's car. Inside the car, the police found a black and white sandal on the floor of the driver's seat and a second matching sandal on the ground just outside the driver's door. Also inside the car, the police found two cartridge casings and blood in the backseat, and a fired bullet under the front passenger seat. An officer also observed damage to the front passenger seat and interior panel of the front passenger door, both appearing to be from a gunshot. An officer further noted that the rear driver's side window was shattered with glass spilling onto the rear driver's side seat. The police performed various forensic testing in and around the vehicle. Gunshot residue testing revealed that a firearm had been discharged in the vehicle. DNA recovered from inside the car was not suitable for

comparison to either defendant or Morgan. Although ballistics testing revealed that the two cartridge casings came from the same firearm, the police could not determine if the casings and fired bullet came from the same weapon because no firearm was ever recovered.

¶ 23 Detectives Hill and Otto were assigned to investigate Morgan's death. During their investigation, they obtained information that defendant might have been involved in the shooting. In November 2012, the police showed Buckner a photo array, and he identified defendant as the last person to exit the white car. Based on Buckner's identification, the police began looking for defendant, and they eventually arrested him on December 4, 2012. Arresting officers brought defendant to the police station and turned him over to Detectives Hill and Otto. After defendant waived his *Miranda* rights, the detectives interviewed defendant. The interview was recorded, and the recording was entered into evidence and played for the jury.

¶ 24 In the interview, defendant initially denied any involvement in the shooting death of Morgan. Defendant told the detectives that he heard "AJ" was involved but did not say exactly how. After being pressed for the truth by the detectives, defendant acknowledged being at the scene and stated he had been in Jones's barbershop with a friend named "Man Man." Defendant hoped to get a quick haircut from Jones, but Jones told him there was not time that night. As defendant was getting ready to leave Jones's barbershop, he heard gunshots and eventually ran away. He told the detectives he boarded a bus with Man Man and went home. Defendant acknowledged seeing Morgan's body on the ground and stated he thought about helping. However, because someone else had already called the police and he had nothing to do with the incident, he just kept running.

¶ 25 During his interview with the detectives, defendant gave multiple accounts of his exact actions and location when he heard the gunshots. When the detectives confronted him about his conflicting statements, defendant admitted that he was "actually in [Morgan's] car." Defendant explained that, while inside the barbershop, he had asked Morgan for a ride to his aunt's house because he did not have his bus card and because Morgan knew his aunt. At another point in the interview, defendant told the detectives that he asked Morgan for a ride outside the barbershop. Defendant acknowledged not "really know[ing]" Morgan, but Morgan agreed to give defendant a ride. One of the detectives attempted to clarify defendant's version of events and stated: "[Morgan] gets in the front of the car. You and Man-Man are in the back seat?" Defendant responded, "[n]ah, just me." Although Man Man had been with defendant earlier, they went separate ways when defendant wanted to go to his aunt's house. While in Morgan's car, defendant said that AJ walked up to the vehicle with another man, pointed a firearm at Morgan, and demanded Morgan's "stuff." Defendant observed that Morgan had "nice jewelry," including a "nice little watch," so he assumed AJ wanted the jewelry. Defendant remarked that "people be getting thirsty" when they see that type of jewelry. After AJ pointed the firearm at Morgan, they began to struggle over the firearm. During the ensuing struggle, defendant heard one gunshot and noticed that Morgan had been struck. As defendant tried to get out of the car, he heard another shot, which caused him to "jump out and start running."

¶ 26 Throughout the interview, defendant adamantly denied ever having a firearm and consistently asserted that AJ had the gun. Although defendant claimed that AJ walked up to Morgan's vehicle out of nowhere, defendant also mentioned that he might have seen AJ at the barbershop before the shooting. Earlier in the interview, one of the detectives asked defendant "where'd you see AJ?" Defendant responded, "the last time I saw AJ was the next day." When

- 7 -

asked by the detectives what AJ did with the firearm, defendant stated: "He ain't got it no more because they ain't got no more guns. The police got the last gun. They got it—caught one of them motha f*** a*** with the last gun." When one of the detectives followed up, specifically about the firearm used to shoot Morgan, defendant responded, "I don't know what AJ did with that other gun. I think he gave it away or sold it or something. 'Cause he ain't got it no more. He been—they been trying to buy guns I guess." Defendant conceded to the detectives that he and AJ used to be "best friends" but told them that he stopped hanging around AJ after the shooting. Defendant remarked "[w]hen dude would do things like that I just get away from that type of crowd." After defendant concluded his interview with the detectives, they placed him in a lineup, and Buckner again identified him.

¶ 27    Following the State's case, defendant moved for a directed verdict, but the trial court denied his motion. In the defendant's case, he presented Marlika Delphie, his cousin, who testified that she lived near Morgan and knew him. Delphie stated that she had observed Morgan and defendant interacting a few times. Defendant did not testify.

¶ 28                          2. Jury Instructions Conference

¶ 29    During the jury instructions conference, the State proposed Illinois Pattern Jury Instructions, Criminal, No. 5.03 (4th ed. 2000), the instruction on the law of accountability. Defendant did not object, and the trial court allowed the instruction. Thereafter, defendant requested a non-Illinois Pattern Jury Instruction on the concept of mere presence. The proposed instruction stated: "The defendant's mere presence at the scene of the crime charged is not sufficient to prove accountability, even where the defendant does not oppose the commission of the crime, knows that the crime is being committed, and flees from the scene." In denying the request, the trial court asserted that the "defense can certainly argue" about defendant's mere presence being insufficient to prove his guilt, but the concept did "not merit a separate instruction." The court further provided the jury with instructions on defendant's presumption of innocence, the State's burden of proof, and the elements needed to convict defendant of first degree murder.

¶ 30                          3. Closing Arguments and Verdict

¶ 31    In the State's closing argument, it posited that defendant worked together with AJ to rob Morgan by threatening him with a firearm inside his vehicle. The State observed that Morgan put up a fight, which resulted in two gunshots being fired inside the vehicle, one of which hit Morgan and ended his life. Afterward, according to the State, defendant ran from the scene. The State highlighted that defendant did not get help, did not call 911 or explain to Buckner what happened, but rather ran after AJ. The State further noted that defendant and AJ were friends and defendant even told the detectives that AJ no longer had the firearm. The State posited that the evidence clearly showed that defendant went into Morgan's car to rob him, and based on the law, when Morgan ended up dead after the planned robbery, defendant was guilty of first degree murder, regardless of whether he or AJ was the one who shot Morgan.

¶ 32    In the defendant's closing argument, defense counsel contended that the State had presented "absolutely no evidence" that defendant shot Morgan, robbed Morgan, attempted to rob Morgan, or entered Morgan's vehicle without Morgan's permission. Counsel highlighted Buckner's testimony that there were four people inside Morgan's vehicle, including Morgan, and the one who exited the vehicle with the firearm was not defendant. Counsel argued that

there was no evidence that defendant "hooked up" with AJ and concocted a plan to rob Morgan or shoot him. Counsel conceded that defendant should have remained on the scene and talked to the police but remarked that he was a 16-year-old boy who could not be expected to react to such a situation like an adult would. Counsel readily agreed that, in defendant's interview with the police, he was untruthful about his presence at Jones's barbershop. But counsel argued that, despite the detectives' persistent questioning, defendant never changed his story about not possessing the firearm and not being involved in some plot against Morgan. Counsel concluded that the only evidence in the case was that defendant "was there," positing that his "mere presence does not mean he did it."

¶ 33    On the same day the jury began deliberating, it sent the trial court a question stating: "The law regarding accountability; does that mean that a person is legally responsible for the actions of another person because they were present during the crime and there is a reasonable doubt as to why they were present during the crime?" In response to the question, defense counsel highlighted his earlier request for a jury instruction on the concept of "mere presence." Counsel posited that, because the jury's question was one of law, his proposed instruction would be an appropriate answer. The State responded that the court should reiterate to the jury that it had been given the applicable instructions and direct the jury to continue deliberating. The court agreed and responded to the jury: "Received all the instructions on the law, please continue to deliberate."

¶ 34    The jury ultimately found defendant guilty of first degree murder, but found the State failed to prove that he was armed with a firearm during the commission of the offense. The record is unclear on how much time elapsed between the trial court's response to the jury question and the jury reaching its verdict. However, the jury reached its verdict the same day it began deliberating.

¶ 35                                                    C. Posttrial

¶ 36    Following the jury's verdicts, defendant moved for a judgment of acquittal notwithstanding the verdict, arguing that there was a complete lack of evidence that he was accountable for AJ's actions. Defendant also moved for a new trial, arguing that the trial court erred in denying his motion to suppress and refusing to provide the jury with the instruction on mere presence in response to its question about accountability. The trial court heard both motions together and denied them. The case proceeded to sentencing.

¶ 37    At the sentencing hearing, the State argued that this case arose because of a "senseless act based on greed" and Morgan's jewelry. Although the State acknowledged defendant was only 16 years old at the time of the offense, it argued that he was armed with a firearm and "committed a very adult act." The State requested a sentence on the higher end of the permissible range for first degree murder. Defense counsel highlighted that defendant had no criminal background prior to this case, which was "indicative of a good kid," and noted that he attended school prior to being incarcerated. Counsel argued that because there was still some "residual doubt" in the case, defendant deserved the minimum sentence of 20 years' imprisonment.

¶ 38    The trial court initially noted that it had considered the evidence at trial, the evidence offered in aggravation and in mitigation, the statutory factors in aggravation and in mitigation, the financial impact of incarceration, the victim impact statements, the parties' arguments, and defendant's presentence investigative report. That report revealed that defendant had no

juvenile adjudications and had a close relationship to both of his parents. Defendant graduated from eighth grade and was a freshman at Calumet Perspectives Charter High School when he was arrested for Morgan's death. The court highlighted defendant's lack of a criminal background and age but remarked that the evidence showed the case started as a robbery that, it believed, defendant and AJ had planned. But, according to the court, defendant and AJ were "surprised" when Morgan put up a fight, and when he did, he was shot. The court observed that, under normal circumstances, it would be inclined to give a defendant close to the maximum sentence. But the court was "moved" by defendant's age and lack of a criminal background and found a near-maximum sentence unwarranted. Conversely, the court found a minimum or near-minimum sentence inappropriate, as such lenience "would deprecate the seriousness of the crime." The court ultimately sentenced defendant to 37 years' imprisonment on count I, merging the remaining counts.

¶ 39 Defendant moved unsuccessfully for the trial court to reconsider its sentence, and this appeal followed.

¶ 40 II. ANALYSIS

¶ 41 A. Motion to Suppress

¶ 42 Defendant first contends that the trial court incorrectly denied his motion to suppress his statements to the police where the evidence showed he lacked the ability to understand his *Miranda* rights. In support of this contention, defendant highlights that, at the time of his arrest, he was 16 years old with an elementary school level reading comprehension, had a history of learning disabilities, consistently scored below average on IQ tests, and had special needs in school.

¶ 43 Under the due process clause of the fourteenth amendment, no state may "deprive any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV. The United States Supreme Court "has long held that certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment." *Miller v. Fenton*, 474 U.S. 104, 109 (1985). "Courts frame the legal inquiry usually through asking whether the defendant's confession was voluntary." *People v. Richardson*, 234 Ill. 2d 233, 252 (2009). Thus, under the fourteenth amendment, due process demands the exclusion of involuntary confessions. *Id.* The fifth amendment to the United States Constitution, which applies to the states through the due process clause of the fourteenth amendment, also protects against involuntary confessions by protecting the right against self-incrimination. U.S. Const., amend. V; *Richardson*, 234 Ill. 2d at 252. "The concept of voluntariness includes proof that the defendant made a knowing and intelligent waiver of his privilege against self-incrimination ***." *People v. Braggs*, 209 Ill. 2d 492, 505 (2003). The *Miranda* warnings are the procedural safeguards that help protect the privilege against self-incrimination. *Colorado v. Spring*, 479 U.S. 564, 572 (1987).

¶ 44 When a criminal suspect waives his *Miranda* rights, he is "not required to know and understand every possible consequence of a waiver of the Fifth Amendment privilege for it to be knowingly and intelligently made." *Braggs*, 209 Ill. 2d at 515. The critical inquiry is whether the defendant was fully aware of the nature of the rights he waived and the ramifications of such a decision. *Id.* Stated otherwise, "[t]he defendant need not understand far-reaching legal and strategic effects of waiving his or her rights or appreciate how widely

or deeply an interrogation may probe; however, the defendant must at least understand basically what those rights encompass and minimally what their waiver will entail." *Id.* When determining whether a defendant understood his *Miranda* rights and made a knowing and intelligent waiver of them, we must consider the totality of the circumstances. *Richardson*, 234 Ill. 2d at 253; *Braggs*, 209 Ill. 2d at 515. Factors include the defendant's age, intelligence, background, mental capacity, education, and conduct. *Richardson*, 234 Ill. 2d at 253-54; *Braggs*, 209 Ill. 2d at 515.

¶ 45 When the defendant is a juvenile, great care "must be taken to assure *** that [his] statement was not the result of ignorance of rights or of adolescent fantasy, fright, or despair." *Richardson*, 234 Ill. 2d at 254. The opportunity to consult with a concerned adult is critical when a juvenile suspect is being questioned by the police. *Id.* Furthermore, when the defendant has limited mental capacity, particular attention must be given to this fact, although an intellectual deficit does not, by itself, render a *Miranda* waiver invalid. *In re W.C.*, 167 Ill. 2d 307, 328 (1995). As our supreme court has observed:

"[I]t is generally recognized that the mentally retarded are considered more susceptible to police coercion or pressure than people of normal intellectual ability, they are predisposed to answer questions so as to please the questioner rather than to answer accurately, they are more likely to confess to crimes they did not commit, they tend to be submissive, and they are less likely to understand their rights." *Braggs*, 209 Ill. 2d at 514.

¶ 46 On a motion to suppress, the State bears the burden to prove by a preponderance of the evidence that the defendant's statement was voluntary. 725 ILCS 5/114-11(d) (West 2012). If the State makes a *prima facie* showing that the statement was voluntary, it meets that burden, and the burden then shifts to the defendant to produce some evidence that the statement was involuntary. *Richardson*, 234 Ill. 2d at 254. If the defendant meets his burden, the burden reverts back to the State. *Id.* The trial court's ruling on a motion to suppress presents both a question of law and of fact. *Id.* at 251. Given that the court observes witnesses testify firsthand, it is in the superior position to determine the credibility of witnesses, assign weight to their testimony, and resolve any conflicts in their testimony. *Id.* As such, the appellate court affords great deference to the trial court on its factual findings and credibility determinations, and we only will reverse such findings if they are against the manifest weight of the evidence. *Id.* A finding will be against the manifest weight when the opposite conclusion is readily apparent or if the finding is unreasonable or appears to be unsupported by the evidence. *People v. Relwani*, 2019 IL 123385, ¶ 18. However, we review the ultimate legal question posed by a motion to suppress *de novo*. *Richardson*, 234 Ill. 2d at 251.

¶ 47 In this case, defendant had what can only be described as the double-whammy of circumstances. First, he was only 16 years old when he waived his *Miranda* rights. As the United States Supreme Court has observed, "[t]he law has historically reflected the same assumption that children characteristically lack the capacity to exercise mature judgment and possess only an incomplete ability to understand the world around them." *J.D.B. v. North Carolina*, 564 U.S. 261, 273 (2011). Second, defendant also had intellectual limitations. In his most recent IQ test, he scored a 70, but just three years prior, in sixth grade, he had scored a 62. Three years prior to that, however, in third grade, defendant scored an 81; though, as Dr. Kavanaugh explained during the suppression hearing, that test was less reliable than the ones he took in sixth and ninth grade. Based on these IQ tests, defendant undoubtedly was

- 11 -

significantly below average on the intelligence spectrum, a fact concluded to by Dr. Kavanaugh. Defendant's repeatedly low IQ scores were also consistent with his poor academic achievement, where he universally performed below his age group, including having only a reading-comprehension level of that of a second grader despite being in ninth grade.

¶ 48 Further evidence of defendant's intellectual limitations can be seen by looking at the Mental Health and Developmental Disabilities Code. See 405 ILCS 5/1-100 *et seq.* (West 2012). Prior to 2012, section 1-116 defined the term "mental retardation" as "significantly subaverage general intellectual functioning which exists concurrently with impairment in adaptive behavior and which originates before the age of 18 years." 405 ILCS 5/1-116 (West 2010). The term "mental retardation" was replaced by the term "intellectual disability" in January 2012, though the definition remained the same. See Pub. Act 97-227, § 94 (eff. Jan. 1, 2012) (amending 405 ILCS 5/1-116). Notably, this court has previously described "[m]ental retardation" as "requiring an IQ of less than 70" and even "less than 75." *In re S.W.N.*, 2016 IL App (3d) 160080, ¶ 73 (citing *People v. Jones*, 2014 IL App (1st) 120927, ¶ 59, and *People v. Daniels*, 391 Ill. App. 3d 750, 754 (2009)). In *Braggs*, 209 Ill. 2d at 514, when our supreme court observed the myriad of issues that are involved with questioning people who were " 'mentally retarded,' " the court "was referring generally to persons below a range of 'normal intellectual ability.' " *In re S.W.N.*, 2016 IL App (3d) 160080, ¶ 73 (quoting *Braggs*, 209 Ill. 2d at 514). This is to say, combine defendant's age with his intellectual limitations, as evidenced by his low IQ, and his case becomes one that requires the utmost scrutiny on whether he understood his *Miranda* rights and could execute a knowing and intelligent waiver of them.

¶ 49 During the detectives' interview with defendant, they allowed him the opportunity to consult with a concerned adult, his mother, who remained present during the entirety of the questioning, including when they informed defendant of his *Miranda* rights. Moreover, at no point during the interview did defendant's mother suggest to the detectives that defendant was limited intellectually, and Detective Hill himself testified that he was unaware of any learning defects or cognitive issues that defendant might have had. Furthermore, there is no evidence or suggestion that the police used any improper techniques with defendant before his mother arrived. In fact, when she and the detectives entered the interview room, defendant was sleeping and not handcuffed. Despite the care the detectives took with defendant, the overwhelming evidence showed that he did not possess the ability to understand his *Miranda* rights and, in turn, could not execute an intelligent and knowing waiver of them.

¶ 50 We begin with defendant's history with the police. Although there was evidence from Dr. Messina that defendant had been arrested multiple times, neither she nor Dr. Kavanaugh were aware of any evidence showing that defendant had ever received *Miranda* warnings previously. See *People v. Reid*, 136 Ill. 2d 27, 58 (1990) (observing that the juvenile defendant "lacked prior experience with the criminal justice system and therefore was unaware of his [*Miranda*] rights"). But even if defendant had been read his *Miranda* rights before, that "in no way means that he understood what was read to him." *In re J.M.*, 2014 IL App (5th) 120196, ¶ 35.

¶ 51 Moving on to the video evidence, which the trial court found as extremely persuasive evidence that defendant understood his *Miranda* rights. It is true that when Detective Otto informed defendant of his rights, defendant indicated he understood them. However, defendant was answering yes in a purely perfunctory manner, and his mechanical affirmative responses cannot be viewed as satisfactory evidence that he actually understood his rights. Importantly, as Dr. Kavanaugh testified to during the suppression hearing, merely because defendant stated

- 12 -

he understood something did not actually mean he did, and he tended to say he understood things to compensate for his intellectual limitations. See *Daniels*, 391 Ill. App. 3d at 792 ("[A] defendant's affirmative responses to questions regarding her understanding of *Miranda* warnings are of little value where defendant lacks the ability to understand those warnings.").

¶ 52 Defendant did indicate to Detective Otto that he did not understand his right to an attorney free of charge if he could not afford one. The trial court relied in large part on defendant's interaction with Detective Otto about this right, characterizing defendant as asking a question about his *Miranda* rights. In turn, the court found defendant's "question" about his right to an attorney indicative of "some cognitive process" and showing "someone who understands what's going on and wants to know where, exactly, things are going." The video evidence merely showed defendant said "no" when asked if he understood his right to an attorney free of charge, which can hardly be viewed as defendant affirmatively asking a question. Moreover, when Detective Otto attempted to explain this right in further detail, he stated "if you can't afford an attorney, the State will pay for an attorney for you." Detective Otto essentially repeated what he had just stated, only adding that "the State," a vague entity for sure for a 16-year-old, would pay for defendant's attorney. In response, defendant stated "uh, all right." Defendant's hesitation and equivocation is hardly convincing proof that he actually understood Detective Otto's clarification. Additionally, while defendant may have been actively listening to Detective Otto, as observed by the court, we cannot equate active listening to actual understanding of *Miranda* rights.

¶ 53 We further note that Detective Otto informed defendant of his *Miranda* rights in the same manner he would have to any intellectually normal adult, which at the time was perfectly proper. However, approximately four years after Detective Otto read defendant his *Miranda* rights, our legislature passed Senate Bill 2370, which became Public Act 99-882, a juvenile justice bill directly related to defendant's circumstances. Under Public Act 99-882, § 10 (eff. Jan. 1, 2017) (adding 705 ILCS 405/5-401.5(a-5)):

> "(a-5) An oral, written, or sign language statement of a minor, who at the time of the commission of the offense was under 18 years of age, is presumed to be inadmissible when the statement is obtained from the minor while the minor is subject to custodial interrogation by a law enforcement officer, State's Attorney, juvenile officer, or other public official or employee prior to the officer, State's Attorney, public official, or employee:
>
> (1) continuously reads to the minor, in its entirety and without stopping for purposes of a response from the minor or verifying comprehension, the following statement: 'You have the right to remain silent. That means you do not have to say anything. Anything you do say can be used against you in court. You have the right to get help from a lawyer. If you cannot pay for a lawyer, the court will get you one for free. You can ask for a lawyer at any time. You have the right to stop this interview at any time.'; and
>
> (2) after reading the statement required by [the preceding paragraph], the public official or employee shall ask the minor the following questions and wait for the minor's response to each question:
>
> (A) 'Do you want to have a lawyer?'
> (B) 'Do you want to talk to me?' "

¶ 54       In the legislative history to Public Act 99-882, Representative Currie highlighted that the bill:

> "simplifies the Miranda warning for people up to the age of 18 since a lot of research shows that young people don't understand the right to waive their opportunity to have a lawyer or waive their opportunity to speak. They often think that if they do anything like that the judge will hold it against them." 99th Ill. Gen. Assem., House Proceedings, May 26, 2016, at 87 (statements of Representative Currie).

Research from our legislature showed that "only [20] percent of minors *** compared to [42] percent of adults understand the Miranda warnings." 99th Ill. Gen. Assem., Senate Proceedings, Apr. 14, 2016, at 55 (statements of Senator Van Pelt); accord Kenneth J. King, *Waiving Childhood Goodbye: How Juvenile Courts Fail to Protect Children From Unknowing, Unintelligent, and Involuntary Waivers of Miranda Rights*, 2006 Wis. L. Rev. 431, 433 (2006) (observing that research has shown "only 21 percent of all children, as compared to 42.3 percent of adults, comprehend the meaning and significance of the *Miranda* warnings" and "about 55 percent of juveniles, as compared to 23 percent of adults, did not understand at least one component of the warnings"). Reflecting the changing landscape in the law that adults and juveniles cannot be compared intellectually (see, *e.g.*, *J.D.B.*, 564 U.S. at 272-74), our legislature undoubtedly appreciated the problem with informing adults and juveniles of their *Miranda* rights in the same manner, rights that many intellectually normal adults do not even comprehend. These concerns about juveniles understanding their *Miranda* rights are the same ones we have in this case, though ours are exacerbated by defendant also having intellectual limitations. Notably, as Dr. Kavanaugh testified, the video evidence did not show that the detectives apprised defendant that his right to counsel meant he could have an attorney present with him during his interview with them, and they never informed defendant how to assert any of his rights, two concerns that Public Act 99-882 addressed.

¶ 55       We recognize that the expert opinions in this case were contradictory, a fact highlighted by the trial court, but the court then went on to make its ruling primarily based upon the video evidence. While the court certainly was in the superior position to determine the relative credibility of Dr. Kavanaugh and Dr. Messina and weigh their testimony accordingly (see *Richardson*, 234 Ill. 2d at 251), it does not appear based on the record that the court meaningfully considered their various opinions, either as supporting the conclusion that defendant understood his *Miranda* rights or supporting the conclusion that he did not. See *Daniels*, 391 Ill. App. 3d at 789 (reversing the trial court's finding that the defendant understood his *Miranda* rights because, in part, the court "did not appear to give any meaningful weight to the tests specifically administered" by the experts). That is to say, we are not reviewing the court's findings with respect to the experts, but rather the court's findings with respect to the video evidence. To that end, we cannot reconcile the court's findings of fact based on the video evidence with what is known generally about juveniles and understanding their *Miranda* rights and what is known about those with intellectual limitations and understanding their *Miranda* rights. But more importantly, we cannot reconcile the court's findings of fact with regard to the video evidence with what is known about defendant, a 16-year-old with documented intellectual limitations, who informed the detectives that he understood his *Miranda* rights in a purely mechanical manner. The evidence from the suppression hearing leaves us with little doubt that defendant did not fully understand his *Miranda* rights and could not provide an intelligent and knowing wavier of them.

¶ 56    We recognize that police officers have a difficult task when interviewing juvenile suspects, and certainly, this task becomes eminently more complicated when a juvenile has intellectual limitations and they are not made aware of those circumstances, as occurred in this case. The problems created by such a confluence of circumstances is why the State's reliance on *People v. Slater*, 228 Ill. 2d 137 (2008), and *People v. Walker*, 2012 IL App (1st) 083655, is not persuasive. Although the State claims both cases support its argument that defendant understood his *Miranda* rights and made a knowing waiver of them, both decisions involved adults with low IQs, not a juvenile with a low IQ. Consequently, the trial court erred in denying defendant's motion to suppress.

¶ 57    Nevertheless, the State argues that, even if defendant's statements should have been suppressed, the error allowing them into evidence was harmless. The improper admission of a defendant's statements to the police is subject to a harmless-error analysis (*People v. Mitchell*, 152 Ill. 2d 274, 328 (1992)), except in cases involving the use of physically coerced statements. *People v. Wrice*, 2012 IL 111860, ¶ 71. Under a harmless-error analysis, the critical question is whether it appears beyond a reasonable doubt that the error did not contribute to the verdict. *People v. Patterson*, 217 Ill. 2d 407, 428 (2005). There are three different approaches to answering this critical question: (1) analyzing the other evidence from the case to determine if that evidence overwhelmingly supported the defendant's conviction, (2) focusing on whether the error contributed to the verdict, and (3) determining whether the improperly admitted evidence was merely cumulative to the other evidence properly admitted at trial. *Id.*

¶ 58    Under either of the three approaches, we cannot find that it appears beyond a reasonable doubt that the error did not contribute to the verdict. While defendant's statements to the detectives placed him in the vehicle where Morgan was shot just as Buckner's testimony did, defendant's statements also provided critical information that was not admitted into evidence through any other source. In particular, defendant's statements showed that he and AJ were formerly best friends, showed his knowledge of what AJ did with the firearm after the shooting, showed that he possibly saw AJ the day after the shooting, and showed his knowledge of Morgan wearing flashy jewelry. These details were crucial pieces of evidence for the jury to find him guilty of first degree murder. Furthermore, defendant's statements also likely diminished his credibility because in those statements, he told the police various accounts of his actions. These multiple accounts made it less likely that the jury would believe his ultimate assertion in those statements that he was not involved. While defendant's statements were not a true confession akin to saying, "I did it," they were incriminating and implicated him in the robbery that turned into the murder of Morgan. Therefore, the improper admission of defendant's statements to the police was not harmless, and his conviction cannot stand.

¶ 59                          B. Retrial or Outright Reversal

¶ 60    Although we have concluded that defendant's conviction for first degree murder cannot stand, we must determine whether to reverse it outright or remand the matter for a new trial.

¶ 61    Under the double jeopardy clause of the United States Constitution's fifth amendment, no person may "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const., amend. V. Similar provisions also exist in the Illinois Constitution (see Ill. Const. 1970, art. I, § 10) and in our statutes. See 720 ILCS 5/3-4(a) (West 2012).

        "The cornerstone of the double jeopardy clause is 'that the State with all its resources and power should not be allowed to make repeated attempts to convict an

individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.' " *People v. Williams*, 188 Ill. 2d 293, 307 (1999) (quoting *Green v. United States*, 355 U.S. 184, 187-88 (1957)).

¶ 62    Although the double jeopardy clause forbids the retrial of a defendant to afford the State another opportunity to present evidence it failed to present in the first trial, it "does not preclude retrial when a conviction has been overturned because of an error in the trial proceedings." *People v. Drake*, 2019 IL 123734, ¶ 20. But if the evidence presented at the first trial was insufficient to support the defendant's conviction, he cannot be retried. *Id.* "[F]or purposes of double jeopardy all evidence submitted at the original trial may be considered when determining the sufficiency of the evidence." *People v. Olivera*, 164 Ill. 2d 382, 393 (1995). That is to say, even though we have determined that defendant's statements to the police should have been suppressed, in determining whether the double jeopardy clause forbids a retrial, we nevertheless consider those very statements. See *People v. Lopez*, 229 Ill. 2d 322, 367 (2008) (for purposes of double jeopardy, "we consider whether the evidence presented at trial, including the now-suppressed handwritten statement, was sufficient to convict"). If there was sufficient evidence presented at the first trial to support the defendant's conviction, retrial is the proper remedy. *Drake*, 2019 IL 123734, ¶ 21. In considering the sufficiency of the evidence, we must determine "whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Lopez*, 229 Ill. 2d at 367.

¶ 63    To prove defendant guilty of first degree murder, as charged, the State had to prove that, without lawful justification, he or one for whose conduct he was legally responsible (1) intended to kill Morgan or do great bodily harm to him or knew that such acts would cause Morgan's death, (2) knew that his acts created the strong probability of Morgan's death or great bodily harm to Morgan, or (3) killed Morgan during the commission of an armed robbery or vehicular invasion. 720 ILCS 5/9-1(a) (West 2012). Although during closing arguments, the State focused on defendant being held accountable for AJ's actions, it nevertheless made some argument directed toward the possibility of defendant shooting Morgan. On appeal, however, the State focuses on defendant's guilt based on a theory of accountability.

¶ 64    Under the law of accountability, as relevant to this appeal, a person is legally accountable for the conduct of another person when

> "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense.
>
> When 2 or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the common design or agreement and all are equally responsible for the consequences of those further acts." *Id.* § 5-2(c).

The accountability statute further states that "[m]ere presence at the scene of a crime does not render a person accountable for an offense; a person's presence at the scene of a crime, however, may be considered with other circumstances by the trier of fact when determining accountability." *Id.* In order to prove that the defendant had the intent to promote or facilitate an offense, the State must prove that (1) there was a common criminal design with the principal

- 16 -

offender or (2) the defendant shared the criminal intent of the principal offender. *People v. Fernandez*, 2014 IL 115527, ¶ 13.

¶ 65    In this case, even when viewing all of the evidence in the light most favorable to the State, there is simply no evidence to conclude that defendant shared the intent of AJ to shoot Morgan. For instance, in *People v. Graham*, 392 Ill. App. 3d 1001, 1003, 1010 (2009), this court found there was sufficient evidence to convict a defendant of first degree murder based on a shared-intent theory of accountability where he instructed his codefendant to shoot the victim. Conversely, in *People v. Taylor*, 186 Ill. 2d 439, 449 (1999), our supreme court found there was insufficient evidence to convict a defendant of aggravated discharge of a firearm based on a shared-intent theory of accountability. In the case, the defendant, who was driving a vehicle, was involved in a traffic altercation, wherein his vehicle and another vehicle were attempting to pass each other on a narrow road. *Id.* at 442-43. The defendant stopped his vehicle, and when he did, his passenger exited the car and fired a gun at the other vehicle. *Id.* at 443-44. The pair then drove off together. *Id.* at 444. In reversing the appellate court, which had affirmed the defendant's conviction, our supreme court acknowledged that the defendant and his passenger left the scene together but concluded there was no evidence presented at trial that the defendant had knowledge that his passenger was going to fire a gun or that he aided his passenger in firing the gun. *Id.* at 448-49. Stated otherwise, our supreme court found the evidence did not show that the defendant shared the criminal intent of the principal offender. *Id.* at 448.

¶ 66    In this case, there is absolutely no evidence that defendant shared AJ's intent to shoot Morgan. In fact, the evidence demonstrated just the opposite. According to Buckner, when defendant exited the vehicle, he was in shock, hysterical and could not even respond to Buckner's question about what happened. Nor is there evidence that defendant knew AJ was even armed before arriving at Morgan's vehicle. Defendant therefore cannot be held accountable for AJ's actions based on a shared-intent theory of accountability. But the shared-intent theory of accountability is one of two distinct manners in which a person can be held accountable for another's actions. See *Fernandez*, 2014 IL 115527, ¶ 13. Unlike the shared-intent theory, under the common-design theory of accountability, the State does not need to prove that the defendant and the principal shared the same intent concerning the charged crime. *People v. Phillips*, 2014 IL App (4th) 120695, ¶ 43. Rather, the State only needs to prove that the defendant " 'had the specific intent to promote or facilitate *a* crime.' " (Emphasis in original.) *Id.* (quoting *People v. Houston*, 258 Ill. App. 3d 364, 369 (1994)). We therefore focus on whether there was evidence of a common criminal design with AJ, or in other words, whether there was evidence that defendant had the intent to promote or facilitate a robbery or vehicular invasion (which itself was predicated on a theft) of Morgan.

¶ 67    As our supreme court found long ago, "[w]here murder is committed during a robbery, all participants in the robbery are deemed equally guilty of murder and it is immaterial who fired the fatal shot." (Internal quotation marks omitted.) *People v. Johnson*, 55 Ill. 2d 62, 67 (1973). It is the fact that the defendant and a co-offender had a common criminal design to begin with that makes him responsible for any act in furtherance of that criminal design. See 720 ILCS 5/5-2(c) (West 2012). The State need not present evidence of a verbal agreement between co-offenders. *People v. Perez*, 189 Ill. 2d 254, 267 (2000). But a conviction based upon accountability cannot rest merely based on a defendant's presence at the scene, even coupled with his knowledge that a crime is being committed. *In re W.C.*, 167 Ill. 2d at 338. Instead, the

- 17 -

trier of fact may infer a common criminal design based upon the circumstances of the crime, including the defendant's presence during the commission of the crime, his "flight" from the scene, his failure to report the crime and his "close affiliation" with any co-offenders after the commission of the crime. *People v. Batchelor*, 171 Ill. 2d 367, 376 (1996).

¶ 68    In this case, the evidence showed that robbery was the original motive in the case. In defendant's statements to the police, he told them that AJ had demanded Morgan's stuff. Additional evidence supports this, including the fact that the face of Morgan's diamond watch was missing and one of Morgan's earrings was on the curb next to his car. The question is whether the circumstance demonstrated a common criminal design between AJ and defendant. The evidence is uncontroverted that defendant was present at the scene when the robbery occurred. In fact, he could not be any closer, as by his own admission and Buckner's testimony, he was in Morgan's vehicle. But, as noted, presence at the time of a crime alone certainly cannot establish accountability (*In re W.C.*, 167 Ill. 2d at 338), and this circumstance is not as persuasive as in cases where there is evidence that the defendant was with his co-offender immediately before the commission of the offense. See *People v. Jaimes*, 2014 IL App (2d) 121368, ¶ 39 (sufficient evidence to convict the defendant of first degree murder under a theory of accountability where, in part, he "instigated the altercation when he disparaged" rival gang members, was driving a vehicle slowly while his co-offender was armed with a rifle, and "stopped abruptly, which allowed [his co-offender] to get out of the vehicle and shoot" the rifle at the rival gang members"). Though defendant in his statements to the detectives briefly mentioned that AJ might have been in the barbershop earlier that night, there is no evidence that defendant arrived to the scene at the same time as AJ.

¶ 69    Similarly uncontroverted is the fact that defendant ran away from the scene of the crime. However, " '[a]bsent other circumstances indicating a common design, presence at the scene and flight therefrom do not constitute *prima facie* evidence of accountability.' " *People v. Willis*, 2013 IL App (1st) 110233, ¶ 79 (quoting *People v. Foster*, 198 Ill. App. 3d 986, 993 (1990)). In many cases, those other circumstances that indicate a common design arise from flight with any co-offenders, which can constitute a close association with those co-offenders after the commission of the crime. See *People v. Ealy*, 2019 IL App (1st) 161575, ¶ 32 (sufficient evidence to convict the defendant of first degree murder under a theory of accountability where he and his co-offender "ran back to the red car" and "fled the scene together"); *People v. Garcia*, 2019 IL App (2d) 161112, ¶ 30 (sufficient evidence to convict the defendant of first degree murder under a theory of accountability where the "defendant fled with [his co-offenders] after the shooting" and he "attempt[ed] to evade police by driving recklessly through two counties").

¶ 70    In this case, it was clear that defendant fled the scene, what was not as clear was whether defendant maintained a close association with AJ following the shooting. At trial, Buckner testified that defendant and AJ went in different directions after exiting Morgan's vehicle. But, in Buckner's prior inconsistent statement, which the State introduced substantively, he testified that they ran from the scene in the same direction. Even accepting Buckner's prior statement as the truth, all his statement showed was that defendant went in the same direction as AJ, not that they left the scene together. Additionally, during defendant's interview with the detectives, he told them he saw AJ the day after the shooting. But this statement contained no more detail than this bare assertion. We have no idea if defendant merely saw AJ in passing in the neighborhood or hung out with him, though defendant claimed to the detectives that he stopped

- 18 -

hanging out with AJ after the shooting. Without any more detail, defendant's mere assertion that he saw AJ the following day does not tend to establish that he had a common design with AJ to rob Morgan. Also in response to a detective's question about the whereabouts of AJ's firearm, defendant stated: "He ain't got it no more because they ain't got no more guns. The police got the last gun. They got it—caught one of them motha f*** a*** with the last gun." After a more specific question by the detective about the firearm used to kill Morgan, defendant remarked: "I don't know what AJ did with that other gun. I think he gave it away or sold it or something. 'Cause he ain't got it no more. He been—they been trying to buy guns I guess." While this may indicate some, minor level of association with AJ, indirectly or even directly, nothing about these assertions demonstrate a *close* level of association. See *Batchelor*, 171 Ill. 2d at 376 (a common-criminal design can be inferred by a defendant's "close affiliation" with any co-offenders after the commission of the crime).

¶ 71    It is further undisputed that defendant failed to report the shooting. But we can conceive of a variety of reasons why a 16-year-old boy would not come forward and report the robbery and shooting to the police, especially given that he was in the vehicle when the crimes occurred. While defendant did not report the shooting to the police, there was also no evidence that he confided in anyone, even a family member, about what he witnessed. See *People v. Green*, 179 Ill. App. 3d 1, 16 (1988) (finding that, in determining whether accountability has been established, the trier of fact may consider "the defendant's failure to report the incident or confide in anyone about it"). But again, given the circumstances of this 16-year-old defendant happening to be in a vehicle where a robbery turned murder occurred, we likewise can conceive of many reasons why he would be afraid to tell even a family member about what happened.

¶ 72    We acknowledge that, when defendant talked to the detectives six weeks after the shooting, he was not always truthful with them, including giving multiple accounts of his actions at the time of the shooting. For one, defendant initially told the detectives that he had left the scene with Man Man, boarded a bus, and went home. Yet later, he told the detectives he asked Morgan for a ride to his aunt's house because he did not have his bus card. Moreover, defendant told the police that he was at the scene of the crime that night because he had hoped to get a quick haircut at Jones's barbershop. But at trial, Jones, who knew defendant, denied ever seeing him at his barbershop of the night of Morgan's shooting. Defendant's entire explanation to the police for why he was on the 8000 block of South Halsted Street and ended up in Morgan's vehicle that night was completely contradicted by Jones. "If a defendant chooses to give an explanation for his incriminating situation, he should provide a reasonable story or be judged by its improbabilities." *People v. Hart*, 214 Ill. 2d 490, 520 (2005). Nevertheless, defendant consistently denied any involvement in a robbery plot and consistently denied having a firearm.

¶ 73    All told, the evidence at trial showed merely that defendant was in the vehicle where Morgan was robbed and shot and that he fled from the scene. Even when viewing the evidence in the light most favorable to the State, in particular defendant's presence in a vehicle when someone he described as his best friend in the past approached, defendant's flight in the same general direction as AJ after the shooting, his possible association with AJ after the shooting, his failure to report the robbery and shooting to the police or confide in anyone about it, his inconsistent answers to the detectives six weeks after the shooting, and his knowledge of Morgan's flashy jewelry, the State presented nothing concrete showing that AJ and defendant had hatched a scheme to rob Morgan. Defendant's guilt can only be sustained if the State

showed that defendant and AJ shared a plan to rob Morgan, and that evidence is utterly lacking. Consequently, we do not find a rational trier of fact could have found all the essential elements of the offense proven beyond a reasonable doubt. We accordingly reverse defendant's conviction outright. See *Drake*, 2019 IL 123734, ¶ 21.

¶ 74 Given our conclusion, we need not address the remaining issues raised by defendant in this appeal. See *People v. Scott*, 366 Ill. App. 3d 638, 649 (2006).

¶ 75                                     III. CONCLUSION
¶ 76 For the foregoing reasons, we reverse defendant's conviction.

¶ 77 Reversed.